**Tian–Yong CHEN, a.k.a. Tian Yong Chen, Petitioner,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Docket No. 00–4136.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 14, 2003.

Decided: Feb. 18, 2004.

Joshua Bardavid (Theodore N. Cox, on the brief), New York, NY, for Petitioner.

Ross E. Morrison, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, on the brief, Andrew W. Schilling, Assistant United States Attorney, of counsel), United States Attorney's Office for the Southern District of New York, New York, NY, for Respondent.

Before: WALKER, Chief Judge, LEVAL and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

The case before us involves a claim of entitlement to asylum by petitioner Tian–Yong Chen, who alleges that he suffered persecution by the People's Republic of China on the basis of his Roman Catholic faith and that he would suffer renewed religious persecution if he were returned to China. In a June 15, 2000 decision, the Board of Immigration Appeals ("BIA") dismissed Chen's appeal from the order of an immigration judge ("IJ"), which denied Chen's application for asylum and for withholding of removal and ordered him deported from the United States if he failed voluntarily to depart. The BIA agreed with the IJ that Chen failed to establish either past persecution on account of his religious beliefs or a well-founded fear of similar persecution in the future if he returned to China. Chen petitions this Court for review of the BIA's decision.

Because both the BIA and the IJ overlooked potentially significant evidence supporting Chen's application for asylum and withholding of deportation, we grant the petition for review, vacate the decision, and remand the case to the BIA, with instructions to remand further to the IJ for further proceedings consistent with this opinion.[1]

## BACKGROUND

Chen illegally entered the United States on or about February 11, 1996, and subsequently filed an application for asylum and withholding of deportation on the grounds that he had been persecuted in China on the basis of his religion, Roman Catholicism, and that he would be arrested and persecuted if he returned to China. We summarize below Chen's declaration of facts asserted in his application.

Chen grew up in a Roman Catholic family in Changle county of the Fujian province of China. In early 1994, his uncle led a campaign to build, in Chen's home village, a Roman Catholic church that would be loyal to the Vatican and the Pope, unlike the government-sanctioned Patriotic Catholic Church that is by design and purpose independent of the Vatican. The uncle was guided in this effort by a Chinese Roman Catholic priest from overseas and a pro-Vatican retired priest of the Patriotic Catholic Church. Chen and a cousin solicited donations from neighbors

---

1. In view of the fact that Chen's deportation proceedings began prior to April 1, 1997, and his order of deportation became final after October 30, 1996, this Court has jurisdiction to consider Chen's petition for review under former § 106 of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1105a (repealed 1996), as modified by any relevant transitional provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 309(c)(4), Pub.L. No. 104–208, 110 Stat. 3009–546, 3009–626 to 627. *See* IIRIRA § 309(c)(1)(B), 110 Stat. at 3009–625; *Diallo v. INS*, 232 F.3d 279, 282 n. 1 (2d Cir.2000).

to raise funds for the church. After a neighbor reported their activity to the local police, Chen and the cousin were arrested and detained for a week in March 1994.

According to Chen, the church was completed in early 1995, at which point he compiled a "simple pamphlet about the life of Christ and the necessity to be loyal to the Pope" that he and his cousin distributed among Catholics in their village, including members of the Patriotic Catholic Church. Chen then learned of an investigation into the pamphlets, which led to a village meeting at which a police officer "encouraged villagers to turn the distributors in." Fearing danger, Chen and his cousin went into hiding in the uncle's house. Chen then learned that the police were looking for him and that his own house had been searched. At that point, Chen left China.

Chen's deportation hearing was held on April 29, 1997, almost seven years ago. Chen, the sole witness, testified in detail regarding the events set forth in his application. Chen testified that he, along with his Roman Catholic family and approximately seventy to eighty other villagers, attended the local Patriotic Catholic Church. He stated that about forty of those members, like Chen's family, also subscribed to *Roman* Catholicism. Chen elaborated on his uncle's plan to build a Roman Catholic Church in Chen's village and his own efforts to solicit donations for the church, and he described his arrest and detention in March 1994. Chen testified that, when he told the authorities that he had not done anything wrong, police officers "scolded" him and "then, they used their hands to beat [him] and [sic] as they were punishing [him.]."

Chen further testified that, upon his release, he continued to solicit donations for the church. He testified that the church

was completed in 1995, and it was identified by a sign stating "Fin Chen Village Roman Catholic Church." Chen elaborated on his efforts to create and distribute a pamphlet describing the tenets of Roman Catholicism, and he explained in greater detail the investigation into the distribution of the pamphlet. He testified that, upon the advice of the church priest and friends, he left the village and went to his uncle's house in the city of Fuzhou. According to Chen, he then called home and learned that the police had visited his house and had summoned him to appear before the authorities, and, as a result, he decided to leave China.

On cross-examination, the Immigration and Naturalization Service ("INS") attorney questioned Chen about the various events to which he had testified. With respect to Chen's testimony regarding his detention in March 1994, the INS attorney asked Chen what he did during that week. Chen responded that "every now and then whenever they were free, they would get me out into the office and ask me questions like who's behind organizing this? Who—who—who backed you up? And they used also some words to scold me."

At the hearing, the IJ received into evidence certain materials submitted by Chen, including a December 11, 1995 United States Department of State report on asylum entitled "China—Country Conditions and Comments on Asylum Applications" (the "Report"). The Report, produced and updated "as appropriate" by the State Department's Office of Asylum Affairs, describes its purpose as

provid[ing] information on country conditions to help adjudicators [in the Executive Office of Immigration Review and the Immigration and Naturalization Service] assess the accuracy of applicants' assertions about country conditions and their own experiences; likely treatment

were the applicants to return; whether persons similarly situated are known to be persecuted; whether grounds for denial are known to exist; and other information relevant to determining the status of a refugee.

*Report* at 2.[2]

In a section entitled "Claims Based on Religion," the Report states that "[a] growing number of [asylum] cases from China, especially from the Fuzhou area in Fujian Province, claim persecution on account of religion" and that most of these applications are "by claimed members of the unsanctioned Christian churches in China." *Id.* at 28. The Report explains that, in the 1950s, the Chinese government established an "official" Catholic Church— the Patriotic Catholic Church—to operate independently from the Vatican, and that no other Catholic establishment has authority to operate openly. *Id.* The Report further explains that the Chinese government established the Patriotic Catholic Church and other Christian organizations "to curb perceived foreign domination of Christian groups," *id.*, and it notes that "central policy is to cajole or force all groups to join official 'patriotic religious organizations' for control purposes," *id.* at 27.

The Report indicates that "[s]poradic repression in some areas has reflected official concern over the [g]overnment's inability to control the rapid growth of membership in [unsanctioned] Christian groups." *Id.* at 29. It further states that "[i]n general, individual worshippers are not harassed by the regime" and that the regime "target[s] leaders," including

priests, "particularly those who maintain connections with Rome." *Id.* The Report also indicates that "authorities are sensitive to proselytizing," *id.*, and that, "although some discreet proselytizing and distributing of religious texts outside official channels is tolerated," the government does "proscribe[ ] and sometimes punish[ ]" religious proselytizing, *id.* at 27.

The Report states that many Chinese are members of unsanctioned churches and that the number of unsanctioned-church members "clearly surpasses the number of members of 'sanctioned' churches." *Id.* at 28. The Chinese government is reported to "generally tolerate[ ] the existence and activities of the unsanctioned churches, as long as services are small and there is no higher-level organizing." *Id.* The Report refers to an October 3, 1995 article in *The New York Times* for a report of "relaxed restrictions on Christian worship in Changle county." *Id.* at 30 n. *.

The Report also refers to the China chapter in the State Department's 1994 Country Reports[3] for the observation that the official Christian churches and the unregistered "underground" churches enjoy a "murky relationship," which includes coexistence and even cooperation. *Id.* at 29. The Country Reports' China chapter also provides further information on "detention of Christians, foreigners' unauthorized proselytizing, and closings of churches in some areas, noting . . . that authorities elsewhere tolerate the existence of unofficial Catholic and Protestant churches as

---

**2.** Asylum reports supplement the State Department's annual Country Reports on Human Rights Practices ("Country Reports" or "Human Rights Report"), which are divided into country-specific chapters and cover human rights practices in those countries. *See* 22 U.S.C. §§ 2151n(d), 2304(b). Asylum re-

ports supplement the Country Reports by providing "additional and current information relevant to the specific standards set forth in the INA." *Report* at 2.

**3.** *See* note 2, *ante.*

long as they remain small and discreet." *Id.*

At the hearing's conclusion, the IJ rendered an oral decision denying Chen's application for asylum and withholding of deportation. The IJ summarized the events as Chen had described them in his application and testimony, including Chen's claim that he had been "interrogated about his activities" when he was detained in March 1994, but the IJ did not mention Chen's claim that he had been beaten. The IJ stated that Chen's "rendition of his situation in his native land failed to demonstrate any reasonable possibility that he would be harmed or threatened if returned to the People's Republic of China at this time." Concluding that Chen had not established past persecution or a well-founded fear of future persecution, the IJ denied Chen's application, while granting Chen's alternative request for voluntary departure.

On appeal by Chen, the BIA reviewed the record and issued a decision on June 15, 2000 upholding the IJ's decision. *In re Chen,* No. A74 588 462, slip op. (BIA June 15, 2000). The BIA concluded that Chen's arrest and detention were insufficient to constitute past persecution. In a footnote to its analysis of past persecution, the BIA remarked that "[a]lthough Chen's counsel in his brief states that [Chen] was beaten by Chinese officials during this detention, the record reflects that [Chen] did not testify that he was beaten, but did testify that he was interrogated." *Id.* at 3 n. 1. Proceeding from its determination on past persecution, the BIA further concluded that Chen failed to establish a well-founded fear of future persecution, finding insufficient evidence in the record "to demonstrate that anyone in China has the present inclination to persecute [Chen]." *Id.* at 3. In support of this conclusion, the BIA cited the Report for its observations

that the Chinese government "principally target[s] leaders" and "tolerates the existence and activities of the unsanctioned churches, as long as services are small and there is no higher-level organizing." *Report* at 28–29.

Chen filed a motion for reconsideration, which the BIA denied. Chen then timely appealed to this Court the BIA's decision affirming the IJ's order denying his application.

On appeal, Chen broadly contends that substantial evidence does not support the BIA's decision, because the BIA improperly weighed the evidence. Chen also argues more specifically that the BIA's decision cannot stand because the BIA erroneously ignored Chen's testimony that he had been beaten when he was detained by local authorities. The INS acknowledges that the BIA erred in stating that Chen did not testify that he had been beaten, but it argues that, even with the consideration of that evidence, the BIA would have reached the same conclusion and thus its decision should be affirmed.

## DISCUSSION

### I. *Relevant Standards*

In order to demonstrate eligibility for asylum, Chen bears the burden of establishing that he is unable or unwilling to return to China because he experienced past persecution or has a well-founded fear of persecution on account of his religion. 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A); *see also Diallo v. INS,* 232 F.3d 279, 284 (2d Cir.2000). "An alien's fear [of future persecution] may be well-founded even if there is only a slight, though discernible, chance of persecution." *See Diallo,* 232 F.3d at 284. If an applicant establishes that he has suffered past persecution, he shall be presumed to have a well-founded

fear of future persecution on the basis of the same claim. *See Secaida–Rosales v. INS*, 331 F.3d 297, 306 (2d Cir.2003). That presumption may be rebutted by a showing that the conditions in the applicant's home country have "changed to the degree that the danger no longer exists." *Id.* Establishing eligibility for asylum by demonstrating the requisite past persecution or fear of future persecution does not, however, automatically entitle the applicant to relief; the decision whether to grant the asylum application then rests within the discretion of the Attorney General of the United States. *See Diallo*, 232 F.3d at 284.

■ In contrast, in order to determine eligibility for *withholding of deportation*, Chen bears the greater burden of establishing that his "life or freedom would be threatened in [China] because of [his] ... religion." 8 U.S.C. § 1231(b)(3)(A). Because of this greater burden, an inability to establish eligibility for asylum necessarily precludes ability to establish eligibility for withholding of deportation. *See Abankwah v. INS*, 185 F.3d 18, 22 (2d Cir.1999). However, unlike the Attorney General's discretion with regard to an application for asylum, if the showing for withholding of deportation is made, no discretion lies with the Attorney General; the application for withholding must be granted. *Id.*

■ On appeal from a decision of the BIA, we must uphold the BIA's determination if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (repealed 1996); *see Diallo*, 232 F.3d at 287.[4] To reverse, we must conclude that no reasonable factfinder could have failed to find that Chen established past persecution or a well-founded

fear of future persecution. *See Diallo*, 232 F.3d at 287. And where the agency's determination is based on an inaccurate perception of the record, omitting potentially significant facts, we may remand for reconsideration or rehearing, *see Alvarado–Carillo v. INS*, 251 F.3d 44, 50 (2d Cir. 2001), or, if circumstances warrant it, a new hearing, *see Qiu v. Ashcroft*, 329 F.3d 140 (2d Cir.2003).

## II. *The Decisions of the IJ and the BIA*

■ What is troubling about this case is the undisputed failure by the IJ and the BIA (jointly and severally, the "immigration court") to acknowledge, much less evaluate, Chen's testimony that he had been beaten. At his deportation hearing, Chen specifically stated that the police "used their hands to beat [him]." A review of the BIA's decision reveals no consideration of that testimony. Indeed, not only did the BIA, in denying Chen's application, fail to mention Chen's testimony on being beaten, but the BIA also stated—explicitly but erroneously—that Chen had *not* testified to being beaten. The IJ likewise failed to mention Chen's testimony on being beaten, acknowledging, as did the BIA, only Chen's claim that he had been interrogated.

In *Alvarado–Carillo v. INS*, 251 F.3d 44, 50 (2d Cir.2001), we granted a petition for review, vacated the BIA's decision, and remanded where the decision, denying an application for asylum and withholding of deportation, "suffer[ed]" from "serious flaws," including a "patently erroneous" statement by the BIA in its summary of the applicant's testimony and other evidence. The BIA found implausible the petitioner's claim that he had been persecuted for eleven years. We described this finding as a "fundamental flaw" in the

4. *See* note 1, *ante.*

BIA's opinion because it rested on the "erroneous conclusion that petitioner was claiming to have been persecuted for eleven years based solely upon his union activities in 1984." *Id.* The BIA had overlooked other activities and events (occurring from 1985 to 1986, and 1990 to 1992) that petitioner claimed were also responsible for the persecution that he suffered during the eleven-year period. *Id.* at 50–51. We noted that these events were described by the petitioner in documentary evidence and in his hearing testimony before an IJ. *Id.* at 51. Because the petitioner had made "a much more extensive claim" than the BIA had considered, any review of the BIA's finding of implausibility, as it currently stood, was "irrelevant," and we remanded for the BIA to reevaluate the petitioner's claim. *Id.*

■ Here, as in *Alvarado–Carillo*, the IJ and the BIA made a fundamental error in ignoring a significant aspect of Chen's testimony in support of his claims of past persecution and future persecution. The IJ erred in overlooking Chen's testimony that he had been beaten, and the BIA perpetuated and compounded that flaw by not only ignoring the testimony but also flatly asserting that no such testimony existed in the record. These errors cannot be viewed as inconsequential, for we agree with the Seventh Circuit that "persecution" in the asylum context means that, although "the conduct must rise above mere harassment," the term includes "more than threats to life or freedom; non-life[-]threatening violence and physical abuse also fall within this category." *Begzatowski v. INS,* 278 F.3d 665, 669 (7th Cir.2002) (internal quotation marks omitted); *see also Liao v. U.S. Dep't of Justice,* 293 F.3d 61, 67 (2d Cir.2002) (noting that "[v]arious types of conduct constitute persecution"). Accordingly, physical harm inflicted on an applicant on account of his religious beliefs is a circumstance relevant to establishing past persecution, and such harm is also relevant to establishing a well-founded fear of future persecution. Indeed, the BIA itself implicitly recognized the relevance of physical violence when it (erroneously) observed an absence of any testimony on being beaten.

Because the BIA did not consider Chen's testimony that he had been beaten, its decision is fatally flawed and we are unable adequately to consider whether substantial evidence supports the BIA's determination that Chen failed to establish either past persecution or a well-founded fear of future persecution. *See Alvarado–Carillo,* 251 F.3d at 50–51; *see also Georgis v. Ashcroft,* 328 F.3d 962, 968 (7th Cir.2003) ("While our review of the IJ's credibility determinations is highly deferential, we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." (internal citation omitted)); *Palavra v. INS,* 287 F.3d 690, 692 (8th Cir.2002) (vacating and remand where "significant parts of the record were not considered" by the BIA); *Chitay–Pirir v. INS,* 169 F.3d 1079, 1081 (7th Cir.1999) (noting that, with the BIA's erroneous interpretation of certain evidence, "[i]t is impossible to be confident that [the applicant's] claim has been fully understood or analyzed"); *Cordero–Trejo v. INS,* 40 F.3d 482, 492 (1st Cir.1994) (concluding that the BIA's decision "cannot stand," given the BIA's failure to address evidence that was "far too extensive and significant to be dismissed").

The INS, however, urges us nevertheless to deny Chen's petition for review on the ground that the BIA "would have reached the same conclusion" even if it had not overlooked Chen's testimony that he had been beaten (Appellee's Br. at 27 n.*). To make this argument, the INS directs us

to the BIA's rejection of Chen's claim of past persecution, in which the BIA cited two cases from other circuits that denied applications for asylum and withholding of deportation where the applicant claimed past persecution based in part on having suffered some form of physical harm. The BIA described one of these cases as holding that "two brief incarcerations where [the] alien was interrogated and beaten does not constitute persecution," *In re Chen*, No. A74 588 462, slip op. at 3 (citing *Kapcia v. INS*, 944 F.2d 702, 708 (10th Cir.1991)), and the other as holding that a "brief detention combined with non-serious injuries does not constitute persecution," *id.* (citing *Prasad v. INS*, 47 F.3d 336, 339–40 (9th Cir.1995)[5]). The INS contends that, even if the BIA had considered and credited Chen's testimony that he had been beaten, the BIA's reference to these two cases "makes clear" that the BIA would have found Chen's testimony insufficient to establish past persecution. (Appellee's Br. at 27 n.*.)

We disagree. In view of the BIA's conclusion that Chen's detention, *as the BIA apparently (mis-)understood it*, did not establish past persecution, it is unremarkable that the BIA accurately described the circumstances of other cases that likewise determined that the applicant had failed to demonstrate past persecution. The citations do not assure us that the BIA, had it been aware of all of Chen's testimony, would have relied on those cases for the different conclusion that Chen's beating was insufficient to establish either past persecution or a fear of future persecution.

Indeed, since the BIA expressly (and erroneously) noted an absence of testimony that Chen was beaten in explaining the rejection of his claim of past persecution, it is a fair inference that the BIA might have regarded a beating as significant. Similarly, had the BIA noted Chen's testimony that he had been beaten, the BIA could have determined that future beating is possible and it may have weighed differently the likelihood that Chen would suffer persecution if he were to return to China and the reasonableness of his fear of future persecution.

Because the BIA's conclusion was predicated on its mistaken belief that the record contained no evidence of any beating, its analysis cannot be regarded as based on the evidence of record, and we are deprived of the ability adequately to review the BIA's denial of Chen's applications for asylum and withholding of deportation. The appropriate course of action is to grant the petition for review, vacate the decision, and remand the case, without passing on the sufficiency of Chen's evidence in support of his application. *See Alvarado–Carillo*, 251 F.3d at 46 ("[W]e vacate the decision but, mindful of the deference generally granted to the BIA, we remand to permit the BIA to reevaluate petitioner's claim in light of this opinion."). And because the IJ also erroneously ignored Chen's testimony that he had been beaten, we instruct the BIA, on remand, to further remand to the IJ. Finally, in light of the considerable passage of time since Chen's original hearing, in which Chen asserted the circumstance overlooked by the immigration court on which we base remand, we conclude that, on remand before the IJ, a new hearing on Chen's application is warranted. *See Qiu v. Ashcroft*, 329 F.3d 140, 154–57 (2d Cir. 2003) (vacating the BIA's decision, due to errors in its analysis, and remanding with instructions to further remand to an IJ for a new hearing, noting, among other things,

5. The BIA's decision incorrectly states that *Prasad* and the quoted material can be found at pages 1425 and 1431, rather than pages 336 and 339–40, of 47 F.3d.

the passage of over eight years since petitioner's original hearing).

### III. *Instructions on Remand*

The immigration court on remand will be obligated to consider whether the *particular circumstances* asserted by Chen establish eligibility for asylum or withholding of deportation. We believe that, in considering those questions, the immigration court should be careful not to place excessive reliance on published reports of the Department of State such as the one received into evidence in the instant case. Such State Department reports are usually the result of estimable expertise and earnestness of purpose, and they often provide a useful and informative overview of conditions in the applicant's home country. But their observations do not automatically discredit contrary evidence presented by the applicant, and they are not binding on the immigration court. *See Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir. 1997) (emphasizing that State Department reports are "not binding, either on the [immigration] service or on the courts"); *see also Gailius v. INS*, 147 F.3d 34, 46 (1st Cir.1998) ("Even as to general country conditions, '[t]he advice of the State Department is not binding ....'" (quoting *Gramatikov*, 128 F.3d at 620)). Thus, where a report suggests that, *in general*, an individual in the applicant's circumstances would not suffer or reasonably fear persecution in a particular country, the immigration court may consider that evidence, but it is obligated to consider also any contrary or countervailing evidence with which it is presented, as well as the particular circumstances of the applicant's case demonstrated by testimony and other evidence.

In addition, the immigration court cannot assume that a report produced by the State Department—an agency of the Executive Branch of Government that is necessarily bound to be concerned to avoid abrading relations with other countries, especially other major world powers—presents the most accurate picture of human rights in the country at issue. We note the widely held view that the State Department's reports are sometimes skewed toward the governing administration's foreign-policy goals and concerns. *See*, e.g., David Sloss, *Hard–Nosed Idealism and U.S. Human Rights Policy*, 46 St. Louis U. L.J. 431, 432 (2002) (observing that, prior to 1998, "the country reports frequently contained half-truths about human rights abuses in friendly countries" so as to "avoid damaging our relationships with those countries"); *see also Gramatikov*, 128 F.3d at 620 ("[T]here is perennial concern that the Department soft-pedals human rights violations by countries that the United States wants to have good relations with.").

The Report received into evidence in this case suggests that the Chinese government, in its efforts to control religious practices in the mid–1990s, focused on "leaders" of unsanctioned churches. *Report* at 29. The Report, however, qualifies its observations by noting that this was the "general" approach of the Chinese government and that the government sometimes engaged in "[s]poradic repression in some areas," and the Report acknowledges that "the authorities are sensitive to proselytizing." *Id.* Moreover, the observation that the government's control efforts were focused on church leaders does not undercut Chen's claims that he suffered past persecution and reasonably fears future persecution. Chen's testimony, if believed, establishes that he participated to a greater degree than an ordinary layperson by soliciting donations and distributing unauthorized religious pamphlets, and that the authorities targeted him for these activities. It is possible that someone in Chen's posi-

tion is regarded as a "leader" in his effort freely to exercise his religious faith, especially in a country where high-level leaders of any church hierarchy—and particularly persons identified as leaders of the *Roman Catholic Church*—reportedly suffer serious adverse consequences and are often physically inaccessible to their congregations.[6] Indeed, activities of the sort asserted by Chen may be more obvious to government authorities than those of high-level church leaders, whose roles may be intentionally concealed by the Vatican, for the protection of the leaders and their

local churches.[7] The Report's observations of religious persecution in China are only useful to the extent that they comment upon or are relevant to the highly specific question of whether *this individual* suffered persecution.

We note further that on remand Chen will be entitled to relief if he shows a well-founded fear of persecution upon return to China. The Report, produced in 1995, no longer necessarily reflects the current attitudes and responses of the Chinese authorities toward the practice of Roman Catholicism—the situation to which Chen

**6.** For widespread acknowledgment of the detention and arrest of high-level leaders of the Roman Catholic Church by Chinese authorities, see, for example, *Report* at 28–29; Richard Spencer, *Rebel priests held in Chinese crackdown*, Daily Telegraph (London), Oct. 28, 2003, at 13 (arrest of twelve Roman Catholic priests); *China has sentenced three Roman Catholic priests to three years in a labour camp*, Times (London), Aug. 3, 2002, at 42 (arrest of three Roman Catholic priests for "cult" activities and "disturbing the peace of society"); Erik Eckholm, *World Briefing: Asia: China: Catholic Bishop Arrested*, N.Y. Times, Mar. 26, 2002, at A10 (arrest of Roman Catholic Bishop Julius Jia Zhiguo); Clay Chandler, *China Jails Catholic Bishop, U.S. Group Reports*, Washington Post, April 24, 2001, at A18 (arrest of Roman Catholic Bishop Shi Enxiang and several other priests); *Dozens of Priests Reportedly Jailed in China*, Washington Post, Feb. 4, 1998, at A24 (imprisonment of several dozen Roman Catholic priests and bishops in China since 1994); *News in Brief*, Washington Post, Sept. 23, 1995, at B7 (arrest of 30 to 40 priests and other Roman Catholics over a five-month period); see also Eckholm, *ante* (noting that "dozens of Catholic leaders [in China] are jailed or under virtual house arrest"); Jane Perlez, *Powell Said to Be Dismayed by Beijing Trial*, N.Y. Times, July 25, 2001, at A8 (reporting that approximately 10 Roman Catholic bishops in China are missing and are believed to be in government custody); Steven Mufson, *Secret Selection of Cardinals Buoys Catholics in Communist Asia*, Washington Post, Jan. 25, 1998, at A25 (reporting that, according to the Connecticut-based Cardinal Kung

Foundation, 22 Roman Catholic church leaders, including 2 bishops, are in jail or detention in China, and that Hong Kong sources put the estimate at several dozen).

**7.** See Mufson, *ante* note 6 (reporting that two men elevated to cardinal were designated by the Pope "in pectore," or "in my breast"—meaning that their elevation was not revealed to the public or to the men "for fear that revealing their names would endanger [them] or the local churches"—and that speculation by Roman Catholics in Asia centered on certain bishops in China); Celestine Bohlen, *John Paul Creates 22 More Cardinals, Including 2 American Archbishops*, N.Y. Times, Jan. 19, 1998, at A8 (reporting that Vatican experts "were speculating that one of the secret cardinals might be from China," where secrecy would "protect [him] politically because of sensitive relations" with the Chinese government); see also Frank Bruni, *Pope Names 31 Cardinals, Future Voters on Succession*, N.Y. Times, Sept. 29, 2003, at A6 (reporting that one cardinal-designate was appointed in 2003 "in pectore," which "usually signals that the man is in a country where Catholics are oppressed"); Alessandra Stanley, *Pope Adds 7 Cardinals to a Record 37 Chosen Last Week*, N.Y. Times, Jan. 29, 2001, at A10 (noting that the Pope's practice of appointing cardinals "in pectore" has generally been limited to "only [those] bishops working in Communist China and Soviet-ruled Lithuania"). *See generally* Robert C. Broderick, *The Catholic Encyclopedia* 289 (1976), available at http://www.newadvent.org/cathen/08025b.htm (on papal appointments "in petto," an Italian translation of the Latin "in pectore").

will return if he is deported.[8] For this reason, we believe that the 1995 Report will be of little value in the assessment of the highly specific question whether this individual has a well-founded fear of future persecution on the basis of his religion. We also note that the other evidence adduced at Chen's original hearing may likewise be of little use in addressing, in the new hearing, the likelihood of his future persecution.

## CONCLUSION

For the foregoing reasons, we conclude that the BIA did not adequately consider Chen's application for asylum and withholding. Because of the BIA's error, we cannot accept its determination that Chen has failed to establish past persecution or a fear of future persecution. Accordingly, we grant Chen's petition for review, vacate the BIA's decision, and remand the case for further proceedings consistent with this opinion.

---

8. In a December 24, 2002 article examining organized religion in China, *The Washington Post* reported that China has continued anti-religious crackdowns in certain areas and noted that, in contrast to Protestantism, China's "longstanding concerns about [Roman] Catholics' relationship to a 'foreign power'— the Vatican—has made expansion difficult for Catholics." John Pomfret, *Evangelicals on the Rise in Land of Mao; Despite Crackdowns, Protestant Religious Groups Flourishing in China*, Washington Post, Dec. 24, 2002, at A1. Police documents smuggled out of China in early 2002 reveal that the Chinese government has highlighted Falun Gong members and Vatican-oriented Catholics among other targets for government-sponsored crackdowns. Philip P. Pan, *China Deepens Assault on Faith; Documents Confirm Resolve to Expand Crackdown*, Washington Post, Feb. 13, 2002, at A1; *see also* Spencer, *ante* note 6 (reporting the arrest of 12 Roman Catholic priests in October 2003); Keith Bradsher, *World Briefing Asia: Hong Kong: Bishop Criticizes China*, N.Y. Times, Feb. 13, 2002 (reporting that Bishop Joseph Zen, leader of the Roman Catholic Church in Hong Kong, stated that "mainland China had been stepping up its repression of the Catholic Church").