**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: October 17, 2008                    Decided: June 19, 2009)

Docket No. 08-0212-ag

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

BIYALO WATARA BABA,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,[1]

*Respondent*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:  McLAUGHLIN, LEVAL, and POOLER, *Circuit Judges*.

Petition for review from an order of the Board of Immigration Appeals denying petitioner, a native citizen of Togo, asylum and withholding of removal.  The Court of Appeals (Leval, *J.*) finds that the agency erred in ruling that the treatment suffered by the petitioner on

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric H. Holder, Jr. has been substituted for former Attorney General Michael B. Mukasey as the respondent in this case.

account of his political opinion, including imprisonment in harsh conditions, near starvation, daily beatings for a week, and a death threat, did not amount to persecution because the petitioner retained his government employment. The agency further erred in failing to accord to the petitioner a presumption of a well-founded fear of future persecution and in its determination of changed country circumstances. Given these errors, we GRANT the petition for review, VACATE the BIA's order, and REMAND to the BIA for further proceedings consistent with this opinion.

BIYALO WATARA BABA, *Pro Se*, New York, NY, for *Petitioner*.

ARAM GAVOOR (Peter D. Keisler, Assistant Attorney General; Barry Pettinato, Assistant Director; John D. Williams, Trial Attorney, Office of Immigration Litigation, *on the brief*), Civil Division, U.S. Department of Justice, Washington, DC, for *Respondent*.

LEVAL, *Circuit Judge*:

Biyalo Watara Baba, a citizen of Togo, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the decision of Immigration Judge ("IJ") Sandy Hom, which denied his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *See In re Biyalo Watara Baba*, No. A 98 645 637 (B.I.A. Dec. 14, 2007), *aff'g In re Biyalo Watara Baba*, No. A 98 645 637 (Immig. Ct. N.Y. City Dec. 7, 2005). Baba testified that on account of his membership in a Togolese opposition party and his participation in political demonstrations, he was arrested and detained by Togolese police in harsh prison conditions on two occasions. During one of these detentions, he was allowed only a near-starvation diet, beaten daily for a week, and threatened with death. The IJ found, and the

2

BIA agreed, that this treatment did not amount to persecution, in light of the fact that Baba was permitted to keep his government job as a preschool inspector. The IJ further determined, and the BIA agreed, that even if Baba had suffered past persecution, by reason of changed country circumstances, he no longer had a well-founded fear of future persecution.

We cannot agree with the IJ's and the BIA's analysis. Baba's evidence, if believed, established past persecution on account of his political opinion. Daily beatings, a near-starvation diet, and a death threat, administered by the national police during a week-long detention in harsh prison conditions and inflicted by reason of one's membership in an opposition political party, satisfy the standard for persecution on account of political opinion, regardless of whether the victim is permitted to retain his employment in a government post. Because Baba demonstrated past persecution, he was entitled to a presumption of a well-founded fear of future persecution. The agency erred in failing to place the burden on the government to demonstrate that, by reason of changed country circumstances, any fear that Baba had of future persecution was not well-founded. Furthermore, the evidence of changed country circumstances advanced by the government and noted by the agency was insufficient to meet this burden. Therefore, we grant the petition and vacate the BIA's decision.[2]

---

[2] We note that the petitioner sent a letter to this court three days prior to his argument requesting a French translator during his oral argument. While the letter appears to have been received by this court, his request went unfulfilled. During the course of his proceedings, the petitioner was assisted informally by a non-attorney legal liaison who was not certified or deemed otherwise qualified to assist with French-English translation. While this falls short of the standard set forth in the Court Interpreters Act, 28 U.S.C. § 1827, we do not think it

**BACKGROUND**

Biyalo Watara Baba was employed in Togo in a governmental civil service post as a director for pre-school inspection. He fled to the United States in September 2004. In his timely affirmative application for asylum, withholding of removal, and relief under the CAT, Baba claimed persecution based on his affiliation with the Togolese Union for Democracy ("UTD"), an opposition political party, which he joined in 1992, and his participation in political demonstrations against the government.

At his hearing before Immigration Judge Hom, Baba testified that he was arrested on December 5, 2001 for participating in a political demonstration against the violence of the regime of President Gnassingbé Eyadéma, Togo's long-serving ruler, which culminated in the assassination of a young opposition leader Tavio Amorin. The police broke up Baba's demonstration with tear gas and by firing blanks. Baba was detained "under harsh conditions" in a "small and stinky cell" in a police station with "more than ten people" where he was given "uneatable food once a day." The detainees also had to urinate and defecate inside the cell. After three days, he was released on the condition that he would not involve himself in future political demonstrations.

Baba, nevertheless, continued to be involved with the UTD, and on July 10, 2003, took part in a political demonstration commemorating Amorin's death and protesting the Eyadéma

necessary to re-argue this case with proper interpretation, especially since we rule primarily in favor of the petitioner.

4

regime. Baba testified that the police tried to break up the demonstration by releasing tear gas and firing blanks. In the ensuing mayhem, Baba was arrested and again detained in a small cell in the same harsh conditions. Baba testified that each morning during this detention, he was awakened by the police and asked if he was going to change his mind about politics. Because he refused to give this assurance, the police then beat him with a long wooden stick. These beatings continued on a daily basis for a week. After a week, the authorities took his picture, fingerprints, and contact information. Then, before releasing him, the police threatened to kill him if he was ever arrested again. As a result of the daily beatings and near starvation, Baba suffered injuries and became weak, requiring medical treatment after his release.

He nonetheless continued his political activities. On January 25, 2004, he again participated in a UTD-organized demonstration against the Eyadéma regime. More than 10 people were killed when Eyadéma supporters confronted demonstrators. This time, Baba fled when he saw the police approaching and thus avoided arrest. After being warned that the police were searching for demonstrators who had been previously arrested, he went into hiding. The next day, he rounded up his family and escaped across the border to Kumasi, Ghana, where he and his wife had family. They managed to subsist through income earned from odd jobs.

Baba surreptitiously reentered Togo in March 2004 with the assistance of a border official. He testified that he returned because he did not feel safe in Kumasi as it was infiltrated with Eyadéma informants. He also wanted to obtain a visa to escape to the United States.

Through sympathizers in the government, Baba obtained a legitimate Togolese passport. From the U.S. Embassy, he obtained a business visa to enter the United States. After obtaining his visa, Baba remained in hiding in Togo for six months because the UTD needed time to raise funds to finance his escape. On September 24, 2004, through the assistance of an airport official, Baba evaded Togolese border control and boarded a flight to Paris, where he then transferred onto a flight for New York City. Shortly following his arrival in the United States, he filed a petition on behalf of himself and his family, seeking asylum, withholding of removal, and relief under the CAT.

After an individual merits hearing on December 7, 2005, the IJ denied Baba's application on the basis that, because Baba was able to retain his government employment, the facts to which he testified did not amount to persecution.[3] The IJ explained that the treatment described

---

[3] While the IJ made comments supporting a negative view of Baba's credibility, including the observations that aspects of the testimony were not "plausible" and noting certain inconsistencies, the IJ never made a finding discrediting Baba's testimony. *In re Biyalo Watara Baba*, No. A 98 645 637, at 8-9 (Immig. Ct. N.Y. City Dec. 7, 2005). As we read the decision, it was based on the insufficiency of Baba's evidence as a matter of law to establish past persecution or a well-founded fear of future persecution.

   The BIA apparently read the IJ's decision the same way, as it affirmed on the basis of "the [IJ's] determination that the incidents complained of did not rise to the level of persecution," without any mention of credibility. *In re Biyalo Watara Baba*, No. A 98 645 637, at 1 (B.I.A. Dec. 14, 2007). Accordingly, we, like the BIA, examine only whether the legal basis for the agency's ruling was correct.

   We note, however, that had the IJ made a finding of adverse credibility on the basis of elements of Baba's testimony which he found to be problematic, we doubt that such a finding could be sustained on the record before the IJ. The IJ's decision noted several factors he considered adverse to Baba's credibility. These were: (1) the unlikelihood that one who was imprisoned and beaten for participating in opposition politics would be allowed to retain a

6

governmental civil service job; (2) an inconsistency between Baba's affidavit and his oral testimony as to his actions following the January 25, 2004 demonstration; (3) the unlikelihood that a person in Baba's position, after fleeing Togo, would have returned and then stayed for six months; and (4) the relative ease of Baba's departure from Togo. None constituted a legitimate basis for an adverse credibility finding.

First, the IJ's disbelief that an individual in Baba's position would have been able to retain government employment rested on mere speculation. To draw a logical inference that one who was imprisoned and beaten by the police for political opposition would also be dismissed from a civil service job in the education system would require substantial information about the functioning of the Togolese government, including the relationship between different bureaucracies. Unless the factfinder has evidence supporting the inference that a person detained by the Togolese police for such activities would lose his post in the education system, disbelief based on this gratuitous assumption would be rank unsupported speculation and constitute an abuse of discretion. To illustrate the point, suppose that a Togolese judge dismissed a U.S. resident plaintiff's case on the basis of the inherent implausibility of her testimony to the effect that she had been arrested by the Fort Lauderdale police in March for disorderly conduct, but nevertheless three months later received a commendation from her employer, the United States Department of Agriculture, as the most valuable and productive employee in her section. Such an inference of implausibility drawn by the hypothetical Togolese judge would amount to rank speculation based on egregiously erroneous assumptions concerning the governmental structure of the United States. In our view, the assumptions that underlay the IJ's sense of implausibility are no less speculative. Whether they were correct or erroneous, we have no idea, but the IJ had no basis in the record to support them.

Second, the IJ's observation of an inconsistency in Baba's testimony about his actions after the January 25, 2004 demonstration was a result of the IJ's misreading of the facts in the record. The IJ wrongly read the first sentence of paragraph 10 of Baba's affidavit to suggest that Baba had returned to his government job after the January 25, 2004 incident. The sentence addressed Baba's actions following his July 2003 detention. The IJ's misreading of the sentence to encompass Baba's actions after the January 2004 incident led to his incorrect conclusion that Baba's affidavit testimony was inconsistent with his oral testimony, in which Baba stated that he fled to Ghana the day after the incident. Actually, Baba's affidavit and oral testimony were entirely consistent. Baba's affidavit stated, "On January 26, 2004, I crossed the Ghanian border . . . with my wife and five children." Petitioner's Aff. ¶ 12.

Third, the IJ's expression of doubt that someone in Baba's position would have returned after fleeing the country was gratuitously based on disregard of Baba's altogether reasonable explanations. Baba testified that he re-entered Togo in order to secure documentation and funds he needed to flee to the United States. He explained that he did not feel safe in Ghana because of

7

in Baba's testimony neither rose to the level of past persecution nor justified a well-founded fear of future persecution. The IJ also ruled that any fear that Baba may have about future persecution was undermined by changed country circumstances, as President Eyadéma had since died, the UTD no longer existed, and elections had taken place. For the same reasons, the IJ denied Baba's demand for withholding of removal based on the CAT.

Baba appealed to the BIA, which, on December 14, 2007, dismissed the appeal. The BIA noted its agreement with the IJ that the incidents complained of did not rise to the level of persecution, noting especially that Baba had been able to return to his government job after each alleged arrest. The BIA further determined that even if Baba had successfully established past persecution, denial of his application was proper because the IJ's "uncontested finding of

---

Eyadéma informants and lacked the financial means to make a more satisfactory escape. He explained fully that he remained longer than he would have liked in Togo because of the difficulty in raising funds to finance his departure and that he remained in hiding during this entire time. We see no logical basis for finding this narrative inherently incredible, which perhaps explains why the IJ stopped short of making a finding of lack of credibility.

Finally, the IJ's disbelief of Baba's testimony on the basis that someone in Baba's position would not have been able to depart easily was again based on a misreading of the evidence in the record. Baba explained that he was only able to evade border controls and secure documentation necessary for his exit through the assistance of friends and political sympathizers. He also testified that the person who assisted him was later apprehended and punished. Thus, Baba's testimony confirmed that there was substantial difficulty and risk involved in his departure.

While we accord "particular deference to an IJ's credibility finding" given the IJ's unique vantage of assessing the petitioner, we do not affirm such a finding where it is based on "bald speculation" or a "misstatement of facts in the record." *See, e.g.*, *Biao Yang v. Gonzales*, 496 F.3d 268, 271-72 (2d Cir. 2007) (internal quotation marks omitted). Had the IJ made a finding of adverse credibility on the basis of the reasons he mentioned, we doubt whether such a flawed finding could stand.

changed country conditions" prevented Baba from establishing a well-founded fear of future persecution. The BIA also determined that Baba's past mistreatment was not of the severity warranting a grant of humanitarian parole notwithstanding the IJ's finding of changed country conditions. The BIA also affirmed the IJ's denial of relief under the CAT.

## DISCUSSION

"When the BIA briefly affirms the decision of an IJ and adopts the IJ's reasoning in doing so, we review the IJ's and the BIA's decisions together." *Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006) (internal quotation marks omitted). We review the BIA's factual findings, including the agency's consideration of relevant evidence of country conditions, under the substantial evidence standard. *See Dong Gao v. BIA*, 482 F.3d 122, 126 (2d Cir. 2007). However, "when the situation presented is the BIA's application of legal principles to undisputed facts, . . . our review is *de novo*." *Monter v. Gonzales*, 430 F.3d 546, 553 (2d Cir. 2005) (internal quotation marks omitted).

**I. Past Persecution**

Under the Immigration and Nationality Act ("INA"), a petitioner is eligible for asylum at the discretion of the Attorney General if he demonstrates that he suffered past persecution or has a well-founded fear of future persecution on account of a statutorily-protected ground. *See* 8 U.S.C. §§ 1101(a)(42), 1158; *see also Xiu Fen Xia v. Mukasey*, 510 F.3d 162, 165 (2d Cir. 2007). A petitioner is also eligible for withholding of removal if he demonstrates a clear probability of persecution on account of a statutorily-protected ground. *See* 8 U.S.C. § 1231(b)(3). Statutorily-

protected grounds include "political opinion" and "membership in a particular social group."[4] In dismissing Baba's appeal, the BIA agreed with the IJ's finding that "the incidents complained of did not rise to the level of persecution." *In re Biyalo Watara Baba*, No. A 98 645 637, at 1 (B.I.A. Dec. 14, 2007). Baba contends that this ruling was in error. We agree.

The term persecution is not defined in the INA. The BIA has defined persecution as "a threat to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive." *Aliyev v. Mukasey*, 549 F.3d 111, 116 (2d Cir. 2008) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 222-23 (B.I.A. 1985)). This court has on several occasions considered the question of what forms of mistreatment rise to the level of persecution. In *Tian-Yong Chen v. INS*, 359 F.3d 121 (2d Cir. 2004), we stated that in order for conduct to constitute persecution in the asylum context, "the conduct must rise above mere harassment."

---

[4] The term "refugee" is defined in the INA as encompassing "any person who is outside any country of such person's nationality, . . . and is unable or unwilling to avail himself or herself of the protection of[] that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

8 U.S.C. § 1158(b)(1)(A) provides, "The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under [§ 1158] if the Secretary of Homeland Security or the Attorney General determines that such an alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

In addition, 8 U.S.C. § 1231(b)(3)(A) provides that, subject to certain exceptions, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

10

*Id*. at 128 (internal quotation marks omitted). We held that conduct amounting to persecution includes "threats to life or freedom" and also extends to "non-life-threatening violence and physical abuse." *Id.* (internal quotation marks and alteration omitted). In *Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61 (2d Cir. 2002), we found that persecution may also take the form of non-physical harm, such as "the deliberate imposition of a substantial economic disadvantage." *Id*. at 67.

In *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332 (2d Cir. 2006), we again addressed the persecution-harassment distinction established in *Chen*. We recognized that "the difference between harassment and persecution is necessarily one of degree that must be decided on a case-by-case basis." *Id*. at 341. As guidance, we defined persecution as "the infliction of suffering or harm upon those who differ on the basis of a protected statutory ground," differentiating it from the dictionary definition of harassment which is "words, conduct, or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." *Id.* (internal quotation marks omitted). We explained that "[w]here an alien, because of her membership in a statutorily protected class, suffers physical abuse and violence at the hands of government agents, . . . [such] evidence, if credible, may preclude a finding that the conduct is mere harassment that does not as a matter of law rise to the level of persecution, for violent conduct generally goes beyond the mere annoyance and distress that characterize harassment." *Id*. at 342; *see also Beskovic v. Gonzales*, 467 F.3d 223, 226 (2d Cir. 2006) (clarifying that the difference between persecution

11

and harassment "must be assessed with regard to the *context* in which the mistreatment occurs") (emphasis in the original).

Recognizing that the dividing line between mere harassment and persecution is difficult to draw with precision, we conclude that the BIA and IJ erred in the view that as a matter of law the mistreatment to which Baba testified did not rise to the level of persecution. By reason of Baba's participation in political demonstrations and his membership in the UTD, he was imprisoned in a tiny cell with more than ten people in unsanitary conditions first for three days and then on the second occasion for a week, was given only one meal per day of inedible food, was beaten every day for a week with batons, and was told that the beatings would only stop once he agreed to change his politics. He was fingerprinted and threatened with death if he was ever caught again engaging in political activity. We have no doubt that such treatment far exceeds mere harassment and rises to the level of persecution. *See Ivanishvili*, 433 F.3d at 341-42; *Matter of Acosta*, 19 I. & N. Dec. at 222.

The IJ and BIA apparently believed that Baba's treatment did not rise to the level of persecution because he was permitted to keep his government job after the arrests. We see no basis for this conclusion. Admittedly, imprisonment, beatings, starvation, death threats, *and the loss of one's job* is worse than imprisonment, beatings, starvation, and death threats, without the loss of one's job. But the distinction is not so great as to make the difference attributed to it by the agency. The brutal treatment Baba testified to was more than sufficient to constitute persecution regardless of whether he was allowed thereafter to keep his position. Treatment

sufficient to rise to the level of persecution on its own accord cannot be relegated to non-persecution simply because the petitioner subsequently retained a government-provided employment, service, or benefit.

Thus, the IJ and BIA erred when they concluded as a matter of law that the mistreatment to which Baba testified did not rise to the level of persecution.

## II.  Well-Founded Fear of Future Persecution and Changed Country Circumstances

Because the agency erroneously found that the harsh treatment Baba testified to did not constitute persecution, it also failed to give Baba the benefit of a presumption of a well-founded fear of future persecution.  The IJ and the BIA placed the burden on Baba to prove a well-founded fear of future persecution.  The law is clear that a showing of past persecution shifts the burden to the government on the question of the petitioner's well-founded fear of future persecution.  *See Poradisova v. Gonzales*, 420 F.3d 70, 78 (2d Cir. 2005) ("A showing of past persecution, although rarely sufficient in itself to entitle an applicant to asylum, automatically gives rise to a rebuttable presumption of a well-founded fear of future persecution.").  The BIA erred by failing to credit Baba with this presumption of a well-founded fear of future persecution.

The government can overcome this presumption only if "a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded." *Guan Shan Liao*, 293 F.3d at 67 (citing 8 C.F.R. § 208.13(b)(1)(i)).  Fear can remain well-founded "even if there is only a slight, though discernible, chance of persecution" so long as a person's "subjective fear . . . is objectively

reasonable." *Dong Zhong Zheng v. Mukasey*, 552 F.3d 277, 284 (2d Cir. 2009) (internal quotation marks omitted).

The IJ found, and the BIA agreed, that the circumstances in Togo had changed to such an extent that any fear that Baba may have about being persecuted upon repatriation is not objectively reasonable. This determination was premised on three findings of fact made by the IJ: first, that President Gnassingbé Eyadéma was no longer in power, having died in February 2005; second, that the UTD itself was no longer in existence, having merged with three other political parties to form the Patriotic Pan-African Convergence (CPP); and third, that elections were held in April 2005 in which the CPP did not participate, but which were "an opportunity for the exercise of democratic principles in the election of a leader." *In re Biyalo Watara Baba*, No. A 98 645 637, at 12-13 (Immig. Ct. N.Y. City Dec. 7, 2005).

If the burden had been properly placed on the government to show that, by reason of changed country circumstances, any fear Baba had of future persecution was not well-founded, we think that the points made by the IJ were insufficient to carry that burden. While it is true that Gnassingbé Eyadéma is no longer in power, he was succeeded by his son, Faure Gnassingbé. Exhibits before the IJ described Faure Gnassingbé's initial assumption of power as illegitimate. The State Department's official Background Note on Togo called it "an unconstitutional move" engineered by Togo's military leadership. *See* Petitioner's Ex. 6 at 6. And while Faure Gnassingbé eventually permitted an election, which he then won, the evidence before the IJ did not support the IJ's finding that the elections were free and fair and had eradicated any fear that

14

Baba may have about political persecution. One report noted that the main opposition leader had been barred from participating in the elections; another described previous polls as rigged and quoted opposition leaders as saying that the 60-day time frame for the elections was too short for free and fair elections. In short, the mere fact that an election was held and the former dictator was replaced by his son was insufficient to show changed country circumstances which would eliminate any reasonably founded fear of future persecution, especially where the same repressive military and police apparatus remains in place. Furthermore, the State Department's Country Report on Human Rights Practices for Togo placed before the IJ plainly asserted that:

> The Government's human rights record remained poor . . . . Security forces committed unlawful killings and beat civilians. Impunity was a serious problem. The Government jailed and at times tortured political opponents and critics of the Government. Prison conditions remained very harsh. Arbitrary arrest and detention were problems.

Finally, there was no basis for the IJ's findings relating to the merger of the UTD into the CPP. Based on Baba's oral testimony in which he said that the UTD had become part of the CPP, the IJ drew the inference that the merger of political parties occurred after Baba's departure and that because of the disappearance of the UTD as a separate entity, Baba no longer had a reasonable basis to fear persecution. These inferences are not supported by any evidence in the record. Baba never said in his testimony that the merger occurred after the events of persecution. (In fact, it appears from sources outside the record that the merger of the UTD into a pan-opposition alliance known as the CPP occurred in August 1999 when Baba was still in Togo and prior to his persecution. *See* Jeanne Moore, *World Briefing: Togo: Opposition Alliance*, N.Y.

15

Times, Aug. 17, 1999, at A8; *see also* Immigration and Refugee Board of Canada: *Togo: Information sur la Convergence Patriotique Panafricaine (CPP)*, UNHCR Refworld, Jan. 29, 2001, *available at* http://www.unhcr.org/refworld/docid/3df4bf0d18.html (last visited June 5, 2009).)  Furthermore, there was no logical support in the record for the further inference drawn by the IJ that the absorption of the UTD into the CPP meant that a member of the opposition alliance no longer had reason to fear persecution by the government.  The finding that, as the result of these changes, Baba no longer could have a well-founded fear of persecution was unsupported and thus arbitrary.

We therefore conclude that the evidence relied on by the agency was insufficient to overcome the presumption in Baba's favor arising from his demonstration of past persecution. Consequently, we vacate the BIA's ruling denying his application for asylum and withholding of removal under 8 U.S.C. §§ 1158, 1231(b)(3).

## CONCLUSION

For the reasons noted, we GRANT the petition for review, VACATE the BIA's order and REMAND for further proceedings.

16