Cheikh TAMBADOU, Petitioner,

v.

Alberto GONZALES,* Respondent.

Docket No. 02–8424–AG.

United States Court of Appeals,
Second Circuit.

Argued: Aug. 25, 2005.

Decided: May 3, 2006.

Brian D. Lerner, Long Beach, CA, for Petitioner.

---

* Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted Attorney General Alberto Gonzales for former Attorney General John Ashcroft as the respondent in this case.

Brent I. Anderson, Assistant United States Attorney, for Eric F. Melgren, United States Attorney for the District of Kansas, Witchita, Kansas, for Respondent.

Before: SACK, KATZMANN, and B.D. PARKER, Circuit Judges.

B.D. PARKER, Jr., Circuit Judge.

The petitioner, Cheikh Tambadou (A73–551–415), a thirty-one-year-old Muslim native of Mauritania, seeks review of an order of the Board of Immigration Appeals ("BIA") dismissing his appeal from the denial for his application for asylum. Tambadou also petitions this Court for review of Immigration Judge Helen Sichel's ("IJ") order denying his application for asylum, withholding of removal and voluntary departure. The IJ denied asylum and withholding of removal because she concluded that Petitioner found a safe haven in Senegal. The BIA also denied asylum, but on different grounds. First, the BIA incorrectly stated that the IJ had relied in part on an adverse credibility finding. And then the BIA concluded that the claim for asylum failed because Petitioner "no longer has an objectively reasonable fear of future persecution" in Mauritania due to a "fundamental change in circumstances" there.

Because we find that the BIA's conclusion regarding changed circumstances was not based on substantial evidence and because the BIA neither adopted nor rejected the IJ's basis for denial, we grant the petition, vacate the order, and remand for further proceedings.

## BACKGROUND

Tambadou was born in the town of Jowel, Mauritania and raised in a family of farmers. His ethnic background is Soninke, a small minority group in Mauritania. The Maurs, the dominant ethnic group in Mauritania, controlled the government and, as Tambadou testified, "have a deep hatred for the Soninke because [of] the color of our skin and our ethnic background." Tambadou supported, but was not a member of, the Liberation Front of Africans in Mauritania ("FLAM"), an organization whose main objective is "equality among all the groups, white and black." According to the United Nations High Commissioner for Refugees ("UNHCR"), the Mauritanian government considers FLAM a threat to its control of the country.

Tambadou further testified that, at age 15, while preparing to work in the field with his brother and father, a military vehicle with six officers inside stopped at the field. When the officers got out of the truck, Petitioner saw that there were a number of people detained in the truck. The officers asked for their identification cards. When his father protested and inquired, the officers stated that they "heard [they] were not Mauritanians, [that they were] from Senegal." Tambadou and his brother were too young to have identification cards, but did have birth certificates. His father returned to the house, retrieved family identification papers, and presented them to the officers, who cursorily examined them, tore them up, and, again, accused them of not being native Mauritanians. Tambadou testified that when he protested, the officers grabbed and beat him, threw him into the truck, and took him to prison where he remained for two months. Tambadou testified that while in jail he received little food and frequent beatings and was housed in a crowded cell where the prisoners slept in shifts due to a lack of space. The guards repeatedly asked Tambadou and the other prisoners to confess that they were Sengalese and not Mauritanian. For over two months, Tambadou maintained that he was Mauritanian, but he and other prisoners eventu-

ally acquiesced and told their jailers that they were Senegalese.

At that point, in February 1990, the officers, at gunpoint, escorted him with fifteen other detainees by truck to a river bank where they were told to cross the river or be shot. Tambadou and the others entered the river by canoe while the officers fired at them. When one of the shots pierced the canoe, Tambadou hit his head on a metal object and the canoe overturned. He and the others were then picked up in a second canoe by the International Red Cross.

Red Cross representatives were present because, during the period 1989 to 1991, more than 70,000 Mauritanians were expelled or fled. Red Cross representatives took the group across the river to Senegal, and Tambadou was then taken, unconscious, to a hospital in Matam, Senegal where he remained for over two months. In May, 1990, the Red Cross representatives transferred him to a refugee camp where he was reunited with his family. At the hearing, Tambadou introduced into evidence his identification card from the camp.

Tambadou testified that he left the camp in November 1995 because the Red Cross was not providing adequate food and went to Dakar where he found work as a porter in a store. His family remained at the camp. In January 1996, Tambadou left Dakar and traveled to the United States by ship, arriving in Miami in February 1996 with the assistance of a French man to whom he had been introduced in Dakar. From there, he traveled to New York and lived in Brooklyn, where he had relatives.

In September 1997, Tambadou applied for political asylum, withholding of removal, and voluntary departure. The IJ denied the application. While the IJ questioned Tambadou's credibility, finding that his testimony "was rather flat" and "lack-

ing in detail," she explicitly did "not base [her] decision on [a] credibility determination." Instead, she concluded that Tambadou "had found safe haven there both at the refugee camp and in the city of Dakar." The IJ's main basis for this conclusion was a letter from the Deputy Representative of the UNHCR which stated that Mauritanian refugees in Senegal had the right to work, own property, attend school, and travel. The IJ stated that "[t]here is absolutely nothing in the record that would suggest that the respondent had not received safe haven in Senegal." Tambadou appealed to the BIA.

The BIA denied Tambadou's appeal, but on different grounds, finding "a fundamental change in circumstances in Mauritania such that [Tambadou] no longer has an objectively reasonable fear of future persecution there." In reaching this conclusion, the BIA relied almost exclusively on a State Department Report published in 1997, which reported that the Mauritanian government was cooperating with humanitarian groups "to assist returnees from the refugee camps in Senegal" who were expelled between 1989 and 1991. The BIA found that, because Petitioner did not offer contradictory evidence, the State Department profile was entitled to deference. The BIA then concluded that Tambadou could not reasonably entertain a well-founded fear of persecution in Mauritania and dismissed his appeal. This appeal followed.

## DISCUSSION

When "the BIA does not adopt the decision of the IJ to any extent, we review only the decision of the BIA." *Ming Xia Chen v. BIA*, 435 F.3d 141, 144 (2d Cir. 2006). Here, the BIA did not affirm or reject the IJ's basis for denying asylum, but rested its decision on a different

ground—a finding of changed circumstances.

As previously noted, although the IJ questioned the Petitioner's credibility, this was not the basis for her decision. The IJ explicitly based her decision entirely on her conclusion that the Petitioner had found a safe haven in Senegal. Furthermore, the IJ did not explain her vague statements regarding Petitioner's demeanor, make particularized findings regarding his credibility, or, for that matter, list a single inconsistency in his testimony. The BIA incorrectly concluded that the IJ had relied on an adverse credibility finding, stating that the IJ "denied the respondent's claim in part because she found that his testimony was not credible." But it did not explain this conclusion or otherwise address the issue of the Petitioner's credibility. We are confounded by this approach. We have stated that because we "would sustain a petition for asylum or withholding of deportation based on credible testimony alone ... [t]he BIA's failure to make a credibility assessment may have denied [Petitioner] the potential benefit of this rule below and frustrates appellate review on this question." *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000).

Upon a finding that an alien could be removed to a safe third country, an IJ previously had discretion to deny asylum under the former 8 C.F.R. § 208.13(d).[2] However, the IJ did not analyze the safe haven issue in detail, but simply stated that there was nothing in the testimony which indicated persecution at the refugee camp or difficulties living and working in Dakar. (This conclusion inexplicably disregarded the Petitioner's testimony about conditions in the refugee camp). While finding that Tambadou had found a safe haven in Senegal, the IJ concluded that it was "questionable whether the respondent was firmly resettled in Senegal." *See* 8 U.S.C. § 1158(b)(2)(A)(vi) (asylum may not be granted to an alien who 'was firmly resettled in another country prior to arriving in the United States'). The BIA did not mention the safe haven issue, let alone adopt the IJ's reasoning. Because the BIA based its decision on changed country conditions, it is not clear whether the BIA adopted the IJ's conclusion regarding Senegal as a safe haven. Significantly, reaching a safe haven in a new country, as opposed to firm resettlement, would not have been a bar to asylum. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 1208.15. Therefore, even if the BIA agreed with the IJ's safe haven conclusion, it could still have found the petitioner eligible for asylum. Consequently, on this appeal, we need only address the BIA's ruling on changed circumstances. "[W]hen the situation presented is the BIA's application of legal principles to undisputed facts ... our review is *de novo.*" *Monter v. Gonzales,* 430 F.3d 546, 553 (2d Cir.2005) (internal quotation marks and citation omitted; alteration incorporated).

■ To establish eligibility for asylum, Tambadou must show that he suffered past persecution, or has a well-founded fear of future persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42); *Diallo,* 232 F.3d at 284. While past persecution may be sufficient to establish eligibility for asy-

---

**2.** *See* 62 Fed.Reg. 10,312–01, 10,342, 1997 WL 93131 (Mar. 6, 1997) ("[A]n asylum application may be denied in the discretion of the Attorney General if the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution."). This provision, in force when the IJ decided this case, has since been repealed. *See* Asylum Procedures, 65 Fed.Reg. 76,121, 76,126 (Dec. 6, 2000) (removing provision to "avoid confusion").

lum, immigration judges are nonetheless obligated to deny asylum in certain situations. *See* 8 C.F.R. § 208.13(b). One such situation is when the government establishes a fundamental change in circumstances so that the applicant no longer has a well-founded fear of persecution. *See Id.* § 208.13(b)(1)(i)(A). This showing can then be rebutted if the applicant demonstrates "compelling reasons . . . arising out of the severity of the past persecution," or establishes "a reasonable possibility" of other serious harm. *Id.* § 208.13(b)(1)(iii). To establish eligibility based on future persecution, an applicant must show a subjective fear that is objectively reasonable. *See Ramsameachire v. Ashcroft,* 357 F.3d 169, 178 (2d Cir.2004). A fear is objectively reasonable "even if there is only a slight, though discernible, chance of persecution." *Diallo,* 232 F.3d at 284 (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

■■■■ We review factual findings of the BIA or an IJ under the substantial evidence standard. *Secaida–Rosales v. INS,* 331 F.3d 297, 306–07 (2d Cir.2003). We will uphold the determination if it "is supported by 'reasonable, substantial, and probative' evidence in the record when considered as a whole." *Id.* at 317 (quoting *Diallo,* 232 F.3d at 287). "To reverse, we must conclude that no reasonable factfinder could have failed to find that [Tambadou] established past persecution or a well-founded fear of future persecution." *Tian–Yong Chen v. INS,* 359 F.3d 121, 127 (2d Cir.2004). We remand for reconsideration or rehearing (or a new hearing) where the IJ's or BIA's determination "is based on an inaccurate perception of the record, omitting potentially significant facts." *Id.*

The BIA based its conclusion solely on information selectively extracted from the Department of State's 1996 Country Report on conditions in Mauritania (the "Report"). *See* United States Department of State, Country Reports on Human Rights Practices for 1996 (1997), *available at http://www.state.gov.* We conclude that the BIA erred in finding changed circumstances in Mauritania such that the Petitioner no longer has a reasonable fear of future persecution.

We have provided guidance on how State Department country reports should be utilized, emphasizing that "the immigration court should be careful not to place excessive reliance" on them. *Tian–Yong Chen,* 359 F.3d at 130. Specifically, we have explained:

> Such State Department reports are usually the result of estimable expertise and earnestness of purpose, and they often provide a useful and informative overview of conditions in the applicant's home country. But their observations do not automatically discredit contrary evidence presented by the applicant, and they are not binding on the immigration court. Thus, where a report suggests that, *in general,* an individual in the applicant's circumstances would not suffer or reasonably fear persecution in a particular country, the immigration court may consider that evidence, but it is obligated to consider also any contrary or countervailing evidence with which it is presented, as well as the particular circumstances of the applicant's case demonstrated by testimony and other evidence.

> In addition, the immigration court cannot assume that a report produced by the State Department—an agency of the Executive Branch of Government that is necessarily bound to be concerned to avoid abrading relations with other countries, especially other major world powers—presents the most accurate picture of human rights in the country at

issue. We note the widely held view that the State Department's reports are sometimes skewed toward the governing administration's foreign-policy goals and concerns.

*Id.* (internal citations omitted).

The BIA, in an abbreviated (three paragraph) opinion, found that the Report established that Mauritanians expelled in 1989–1991 were being repatriated without persecution and then concluded that Tambadou had failed to present evidence to the contrary. To support its finding, the BIA relied almost exclusively on its own case, *Matter of T–M–B*, for the proposition that where an asylum applicant offers no contradictory evidence to a State Department report, the BIA defers to the report. 21 I. & N. Dec. 775, 779 (BIA 1997), *rev'd by Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc). Here, not only was there contradictory testimony that the BIA ignored, but it failed to use the information in the Report in a case-specific manner and supplement it with further analysis. Moreover, *Matter of T–M–B*, had been reversed by the Ninth Circuit en banc, *before* the BIA decided this case. The Ninth Circuit found that the BIA erred as a matter of law because it failed to conduct an "individualized analysis of how changed conditions [would] affect the specific petitioner's situation." *Borja*, 175 F.3d at 738 (internal quotation marks omitted). The Ninth Circuit noted that "[i]nformation about general changes in the country is not sufficient." *Id.* (internal quotations marks omitted). No such analysis was conducted in this case. The BIA generally stated that refugees were reportedly being repatriated over a number of years, and concluded that this analysis was sufficient to deny asylum. For several reasons, we do not agree.

To begin, the Report catalogues conditions as they existed in Mauritania in 1996.

When the BIA considered this appeal in 2002, it is difficult to see how the Report could be said to describe "current" conditions. *See Tian–Yong Chen*, 359 F.3d at 131–132. Also, in his appeal to the BIA, the Petitioner cited the Report and explained that it did not "indicate any significant changes in the human rights conditions of black ethnic people in Mauritania." Citing his testimony before the IJ, Tambadou asserted that for him "to return to a country where, according to the State Department, slavery in the form of unofficial, forced or involuntary servitude exists, will undoubtedly subject him to continued persecution by the very government which ousted him from Mauritania." In addition, he testified that the "prevailing Mauritanian governmental attitude also allows the Mauritanian government to continue to practice human rights abuses because the victims who are part of the Mauritanian status quo have no recourse against this atrocious treatment." Moreover, during cross-examination, the government asked whether Tambadou was aware that, "according to the Department of State that of the approximately 70,000 Afro–Mauritanians who were expelled from Mauritania and fled to Senegal during [1989–1991], that it's estimated that 30,000 to 35,000 have returned?" Tr. of Removal Hearing, Sept. 19, 1997, at 39. Petitioner answered: "I heard that people went back. What I hear right now that those who went back, many of them were killed. I am concerned about myself. Others, what they do, I'm not concerned about it but I do know that some of them went back and they were killed." *Id.* at 39–40. Petitioner also testified that, "They do not want us physically in there because they don't like us and they will kill us." *Id.* at 40.

Thus, the record does not support the BIA's conclusion that Petitioner presented no evidence in response to the "changed

conditions" described by the Report. On the contrary, the BIA deferred to the Report in a casual, conclusory fashion, ignored the contradictory information that Tambadou presented, and then failed to make the required individualized analysis.

The BIA also ignored significant information favorable to Tambadou in the Report. The Report itself contradicts the BIA's finding. The Report notes that Mauritania is making an effort to assist those who were expelled or fled. But, as Petitioner points out, the Report is silent regarding the treatment of those individuals once they return. The Report also vacillates as to the "current" (1996) conditions for Soninke in Mauritania. The Report is, however, clear that significant problems remain for minority groups in Mauritania and that abuses continue. Specifically, the Report identifies abuses of returned refugees in communities along the Senegal River, noting only that the "extent of the abuses [had] declined." The BIA apparently did not fully perceive the significant distinction between a drop in abuses and an end to abuses.

The Report does not support the BIA's conclusion that conditions have so improved such that the Soninke are no longer persecuted; in fact the Report cites "credible reports" of police torturing individuals in custody. According to the Report, conditions in Mauritania have improved since the 1989–1991 period, when 70,000 Mauritanians were expelled by force. However, the Report notes that many members of certain ethnic groups, including the Soninke, feel excluded from political representation and that "some hostility and bitterness persist[s] between ethnic groups." In addition, the Report notes widespread distrust of the judicial system and a belief that security officials are "not subject to legal restraints," in part due to a failure to "bring to justice officials who commit abuses and fail to observe legal procedures."

■ In sum, the BIA used an outdated report that may not have accurately reflected the current conditions in Mauritania, accepted general statements in this outdated Report as fact, ignored the complexities of the reported information, did not make an individualized assessment of Tambadou's situation, and failed to consider his evidence which contradicted the changed conditions described in the Report. *See Tian–Yong Chen*, 359 F.3d 121 at 131–32. Moreover, the Board did not engage in an individualized analysis beyond its general conclusions based on its over-simplified reading of a complex document. Thus, the BIA's changed circumstances determination, its sole basis for denying the appeal, was not supported by "reasonable, substantial, and probative evidence in the record when considered as a whole." *Secaida–Rosales*, 331 F.3d at 307 (internal quotation omitted). Consequently, we vacate the BIA's decision and remand.

After the BIA concluded that the Petitioner was not eligible for asylum, it determined that Tambadou also had failed to meet the more stringent standard for withholding of removal. *See* 8 U.S.C. § 1231(b)(3). Because the BIA erred as to its denial of asylum, we vacate this conclusion as well and remand for the BIA to determine, in the first instance, if he is eligible for withholding of removal.

## CONCLUSION

For the reasons stated above, Tambadou's petition for review is GRANTED, the BIA's order is VACATED, and the case is REMANDED to the BIA for further proceedings consistent with this decision.