07-2102-ag
Passi v. Mukasey

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

Argued: April 23, 2008                                    Decided: July 23, 2008

Docket No. 07-2102-ag
————————————

SYLVESTRE PASSI,

*Petitioner,*

—v.—

MICHAEL B. MUKASEY, Attorney General,[*]

*Respondent.*

————————————

Before:

JACOBS, *Chief Judge*, KEARSE, and KATZMANN,
*Circuit Judges*.

Petition for review of an April 19, 2007 order of the Board of Immigration Appeals affirming the Immigration Judge's denial of petitioner's application for asylum. The petition is granted, and the case is remanded. Chief Judge Jacobs concurs in a separate opinion.

————————————

MATTHEW J. HARRIS (Eric A. Wuestman, *of counsel*)
Brooklyn, N.Y., *for Petitioner*.

LINDSAY B. GLAUNER, Trial Attorney, Office of
Immigration Litigation (Leslie McKay, Peter D. Keisler, *of counsel*) U.S. Department of Justice, Washington, D.C., *for Respondent*.

————————————

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as the respondent in this case.

KATZMANN, *Circuit Judge*:

Sylvestre Passi petitions for review of the Board of Immigration Appeals' (BIA) April 19, 2007 order affirming Immigration Judge (IJ) Elizabeth A. Lamb's denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). The BIA assumed that Passi had testified credibly about an incident in which he was beaten into unconsciousness during a military raid, but concluded that country conditions had changed such that he no longer had an objectively reasonable fear of persecution. Because we find that the BIA could not have conducted an individualized analysis of how changed country conditions would affect someone in Passi's situation, we grant the petition, vacate the BIA's order, and remand for further proceedings.

I

Sylvestre Passi is a native and citizen of the Republic of Congo. He claims to have entered the United States on July 23, 2001. In May 2002, he filed an application for asylum, withholding of removal, and CAT relief, and was subsequently placed in removal proceedings.

At a merits hearing in July 2005, Passi testified that in November 1997, members of the "Cobra" militia loyal to Congo's current president Denis Sassou-Nguesso entered his home in Brazzaville, shot and killed his father, and beat him into unconsciousness. He claims that he and his family were attacked because of their Lari ethnicity and their perceived support for Sassou-Nguesso's predecessor and rival, Pascal Lissouba; Passi's father had been a police officer under Lissouba's regime. After the attack, Passi and his family fled to Gabon and from there, Passi eventually came to the United States. The IJ admitted several documents into evidence including

-2-

the 1997, 2003, and 2004 United States Department of State Country Reports on Human Rights Practices for the Republic of Congo, a 1999 Amnesty International report on Congo, and several news articles from 2002 and 2003.

In an oral decision, the IJ pretermitted Passi's asylum application finding that he had not met his burden of proving that he applied for asylum within one year of his arrival in the United States as required by 8 U.S.C. § 1158(a)(2)(B). *In re Sylvestre Passi*, No. A 95 468 091 (Immig. Ct. N.Y. City Aug. 29, 2005). The IJ found that Passi was not a "totally credible witness." She then went on to consider whether Passi was eligible for withholding of removal, noting that he faced the higher burden of proof of showing that it was more likely than not that he would be persecuted. The IJ rejected Passi's withholding of removal claim stating:

> I've read the background materials submitted including the State Department materials. The State Department talked about the tribe to which he says he belongs and I believe he says it's in the southern part but there is nothing in the record that says that his tribe is signaled [sic] out for any problems now, especially now. The times have changed, the political situation has changed and I have no reason to believe that he would be persecuted were he to return to his country.

*Id.* The IJ also rejected his CAT claim.

Passi appealed only the denial of his asylum claim to the BIA. The BIA affirmed the IJ's denial of asylum, but on different grounds. *In re Sylvestre Passi*, No. A 95 468 091 (B.I.A. Apr. 19, 2007). The BIA assumed that his asylum application was timely filed and that he had testified credibly about his past persecution, but explained in a short per curiam decision:

> [W]e concur with the Immigration Judge's ultimate decision that conditions in the Republic of Congo have changed to the extent that there is no evidence in the record that [Passi] would face persecution there. In that regard, we find no indication in the most recent objective evidence of record that [Passi,] who was beaten into unconsciousness during a 1997 raid by Cobra militia, presently has an

-3-

objectively reasonable fear of persecution in the Republic of Congo based on any past persecution. Further, we find no evidence that [Passi] has an independent well-founded fear of future persecution by Cobra militiamen on account of his Lari ethnicity, his imputed political support of former President Pascal Lissouba, or any other protected ground under [8 U.S.C. § 1158], if he is removed to the Republic of Congo.

*Id.* (citations omitted).

Passi timely petitioned this Court for review, again only challenging the denial of his asylum claim.[1]


II

When the BIA affirms an IJ's decision on different grounds, we review only the BIA's decision. *See Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). As we have explained on several occasions, however, when the BIA affirms the IJ's decision in some respects, but not others, we may also review the IJ's decision, although our review is confined to those reasons for denying relief that were adopted by the BIA. *See Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005). *See generally Ming Xia Chen v. BIA*, 435 F.3d 141, 144 (2d Cir. 2006). In this case, the BIA assumed that Passi's asylum application was timely filed and that he had testified credibly, so we may not rest on the IJ's adverse credibility finding or her ruling pretermitting Passi's asylum claim. *See Yan Chen*, 417 F.3d at 271. Instead the BIA adopted the IJ's reason for denying Passi's withholding of removal claim—that country conditions had changed—to reject his asylum claim. Although we are reviewing the BIA's decision, we find it informative in this case to look to the IJ's decision as well to decipher the reasoning in which the

---

[1]Because Passi did not raise his withholding of removal and CAT claims either before the BIA or in this Court, we do not consider them.

BIA "concur[red]" just as we would if the BIA had merely modified or supplemented the IJ's decision.

We review the agency's factual findings under the substantial evidence standard treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Dong Gao v. BIA*, 482 F.3d 122, 126 (2d Cir. 2007). We will, however, vacate and remand for new findings if the agency's reasoning or its factfinding process was sufficiently flawed, for example, where the agency's determination was "based on an inaccurate perception of the record, omitting potentially significant facts." *Tambadou v. Gonzales*, 446 F.3d 298, 302 (2d Cir. 2006) (internal quotation marks omitted); *see also Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 406 (2d Cir. 2005). We review *de novo* questions of law and the application of law to fact. *See, e.g.*, *Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003).

The burden of proving eligibility for asylum rests on the applicant. 8 C.F.R. § 208.13(a). An applicant may qualify for asylum either because he has suffered past persecution or because he has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). A fear of persecution may be "well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo v. INS*, 232 F.3d 279, 284 (2d Cir. 2000) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)). This standard is considerably easier to meet than the standard for withholding of removal, which requires the applicant to establish that it is more likely than not that his "life or freedom would be threatened" on account of a protected ground. *See* 8 C.F.R. § 208.16(b); *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004). Where, as the BIA assumed here, an asylum applicant has demonstrated that he suffered past persecution, a presumption arises that

-5-

he has a well-founded fear of persecution. 8 C.F.R. § 208.13(b)(1). While past persecution is sufficient to establish eligibility for asylum, regulations nonetheless direct the IJs to exercise their discretion to deny asylum in certain situations. 8 C.F.R. § 208.13(b)(1)(i); *Tambadou*, 446 F.3d at 301-02. One such situation is when the government proves by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," 8 C.F.R. § 208.13(b)(1)(i)(A), thus rebutting the presumption that arose upon the initial showing of past persecution. *See Jalloh v. Gonzales*, 498 F.3d 148, 151 (2d Cir. 2007).

III

This petition calls on us to decide whether substantial evidence supports the BIA's finding that conditions in Congo have fundamentally changed such that Passi no longer has a reasonable fear of persecution. To support its two-sentence conclusion that "conditions in the Republic of Congo have changed to the extent that there is no evidence in the record that [Passi] would face persecution there," the BIA cited only the 2004 State Department country report. While the State Department country reports often provide "a useful and informative overview of conditions in the applicant's home country," we have instructed the immigration courts "not to place excessive reliance" on them. *Tian-Yong Chen v. INS*, 359 F.3d 121, 130 (2d Cir. 2004). In *Tambadou v. Gonzales*, we explained that the BIA cannot rely in a conclusory fashion on information in a State Department country report about "general changes in the country." 446 F.3d at 303 (internal quotation marks omitted). Instead, we explained, the BIA must "use the information in the [r]eport in a case-specific manner and supplement it with further analysis,"

-6-

that is, the BIA must "conduct an individualized analysis of how changed conditions would affect the specific petitioner's situation." *Id.* (internal quotation marks and alteration omitted).

While the 2004 country report noted significant improvements in conditions in Congo—the civil war that had engulfed the country in the late 1990s had come to a halt and there were no recent reports of politically motivated disappearances or political killings by the Congolese government or its agents—the report does not support the BIA's inference that those general improvements rebut the presumption of a well founded fear of persecution for someone in Passi's situation—a Lari who had been branded a supporter of former president Lissouba. Moreover, as in *Tambadou*, 446 F.3d at 304, the BIA ignored "significant information favorable to" Passi in the country report as well as several news articles submitted by Passi describing continued unrest in his home city of Brazzaville and the surrounding Pool region. Most notably, the 2004 country report confirms that Sassou-Nguesso—whose Cobra militia beat Passi into unconsciousness and killed his father—is now firmly in control of Congo and his "[g]overnment's human rights record remains poor."[2] The report noted that although there were "some" improvements, "serious problems remained," particularly in Passi's home region where there are continued clashes between the mainly Lari "Ninja" rebels and Sassou-Nguesso's government forces. The 2004 country report stated that "[u]ncontrolled and unidentified armed elements remain active in the Pool region, despite an ongoing demobilization and reintegration program following the March 2003 Peace Accord between the Government and [the] Ninja

---

[2]We do not hold today that the agency could *never* find that the presumption of a well founded fear of persecution has been rebutted while the regime responsible for the past persecution remains in power, but given the explicitly equivocal nature of the evidence relied on by the IJ and BIA in this case, such a finding is certainly not supported by substantial evidence here.

rebels," and noted continued violence and harassment by either "uncontrolled government security forces or former Ninjas." In December 2003, uncontrolled Republican Guard government forces attacked Ninja elements in Brazzaville resulting in restrictions on civilian movement, and there was "renewed harassment and intimidation by uncontrolled and unidentified armed elements." While there were fewer reports that government forces killed civilians in the Pool region than in previous years, the 2004 country report stated that members of the security forces "committed human rights abuses" and were "responsible for beatings, physical abuse of detainees, rapes, arbitrary arrest and detention, looting, solicitation of bribes and theft." The report also noted that "[d]iscrimination on the basis of ethnic regions remained a problem." The news articles Passi submitted describe the deaths of civilians at the hands of either the military or a resurgent militia in a suburb of his home city Brazzaville, the displacement of 50,000 people in Brazzaville, and clashes between government troops and rebel fighters in Brazzaville and in the Pool region surrounding the city.

There is no indication from the BIA's decision that it considered any of this evidence. Of course, *Tambadou* does not necessarily require the BIA to make particularized, on-record findings whenever it finds a change in country conditions. *See, e.g.*, *Hoxhallari v. Gonzales*, 468 F.3d 179, 187 (2d Cir. 2006) (per curiam). But here, the BIA improperly inferred that the general improvements in conditions in Congo rebutted the presumption that someone in Passi's situation—a Lari who had been branded a supporter of former president Lissouba—would continue to have a well founded fear of persecution. Importantly, Passi was from Brazzaville, in the Pool region, where the ongoing ethnic and political violence appears the most severe. Since the agency made no finding that Passi could relocate out of that troubled area, the regulatory

presumption that such "internal relocation would not be reasonable" remains unrebutted. *See* 8 C.F.R. § 208.13(b)(3)(ii). As in *Tambadou*, it appears that the BIA did not consider the "significant distinction between a drop in abuses and an end to abuses." 446 F.3d at 304.

The government relies on *Hoxhallari v. Gonzales*, in which we held that where "changed conditions evidently prevail in a country that is the subject of an appreciable proportion of asylum claims (and, as a result, we can safely assume that IJs have developed considerable expertise related to that country's current conditions), an immigration judge need not enter specific findings premised on record evidence when making a finding of changed country conditions." 468 F.3d at 187. Hoxhallari was a native of Albania who allegedly had been persecuted for his support of the Democratic Party by the Communist regime prior to its fall from power in 1991, but his family had been living in Albania unmolested since 1991. *Id.* at 182-83. Although we noted that the IJ's discussion of changed country conditions was perfunctory, we were willing to accept that the IJ could rely on his specialized knowledge of "salient historical events" in countries from which many applicants seek asylum. *Id.* at 186-87. Thus the IJ could recognize that "Albania is no longer a Communist tyranny run by a psychopath," without "robotic incantations" for the record. *Id.* at 187 (internal quotation marks omitted). In this case, by contrast, the change in country conditions in Congo was not nearly as dramatic as the fall of the Communist regime in Albania (in fact, the president responsible for Passi's past persecution is still in power), and there is no indication that Congo is the source of an appreciable proportion of asylum claims such that we could be confident in the agency's familiarity with the country. *See Souleymane Niang v. Mukasey*, 511 F.3d 138, 149 (2d Cir. 2007) ("*Hoxhallari* stands for the 'uncontroversial propositions that [i] this Court is not ignorant of indisputable historical events

(such as the partition of India, the break-up of the Ottoman Empire, or the fall of Communist regimes in the Balkans), and [ii] we will not assume that the agency suffers from such ignorance.'" (quoting *Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 272 (2d Cir. 2007)). Thus we cannot approve of such cursory treatment in this case. *See id.*; *Tambadou*, 446 F.3d at 303-04.

IV

The BIA improperly inferred that Passi no longer has a well founded fear of persecution because its inference was based entirely on a country report that details general improvements, while indicating that Passi's hometown (which the agency was required by regulation to presume is unreasonable for him to leave) is still troubled by ethnic and political conflict. We remand for the agency to conduct an individualized analysis of whether the changes in conditions in Congo were so fundamental that they are sufficient to rebut the presumption that Passi's fear of persecution is well founded. Accordingly we **GRANT** the petition for review, **VACATE** the decision of the BIA, and **REMAND** the case for further proceedings consistent with this opinion. Passi's motion for a stay of removal pending the outcome of this appeal is **DISMISSED** as moot.

DENNIS JACOBS, <u>Chief Judge</u>, concurring:

I concur with Judge Katzmann's opinion because it is an appropriate application of <u>Tambadou v. Gonzales</u>, 446 F.3d 298 (2d Cir. 2006). <u>See</u> <u>United States v. Brutus</u>, 505 F.3d 80, 87 n.5 (2d Cir. 2007) ("[W]e are bound by the decisions of prior panels until such time as they are overruled either by an <u>en banc</u> panel of our Court or by the Supreme Court.") (internal quotation marks and citation omitted). I write separately to emphasize that <u>Tambadou</u> speaks to circumstances rarely presented to this Court, and to warn against overreading our rather limited holding in that case.

<u>Tambadou</u> contains wording that is sound in its context, and should not be misconstrued. That case concerned an asylum applicant who had been expelled from his native Mauritania to Senegal because of his ethnicity. The BIA denied asylum, concluding that country conditions in Mauritania had changed such that Tambadou no longer had a well founded fear of persecution there. "The BIA based its conclusion solely on information selectively extracted from the Department of State's 1996 Country Report on conditions in Mauritania." <u>Tambadou</u>, 446 F.3d at 302. The report--

which was six years out of date when the BIA considered Tambadou's case--"reported that the Mauritanian government was cooperating with humanitarian groups 'to assist returnees from the refugee camps in Senegal' who were expelled between 1989 and 1991." Id. at 300. Thus, "[t]he BIA generally stated that refugees were reportedly being repatriated over a number of years, and concluded that this analysis was sufficient to deny asylum." Id. at 303.

The BIA, failing to notice Tambadou's testimony that many of those who were repatriated had subsequently been killed, erroneously ruled that "because Petitioner did not offer contradictory evidence, the State Department profile was entitled to deference." Id.

We vacated the BIA's finding of changed country conditions noting that (1) "not only was there contradictory testimony that the BIA ignored, but it failed to use the information in the Report in a case-specific manner and supplement it with further analysis," id.; and (2) "the BIA deferred to the Report in a casual, conclusory fashion, ignored the contradictory information that Tambadou presented, and then failed to make the required individualized analysis. The BIA also ignored significant

-12-

information favorable to Tambadou in the Report," id. at 304.

The reference to the need for "individualized analysis" is context specific. When yanked out of its context, it is easily subject to at least three misreadings.

First, to the extent that an asylum applicant's personal history and characteristics do not constitute protected grounds, Tambadou does not require the agency to consider those facts in determining whether country conditions have changed. Such a requirement would gut the usefulness of country reports as an indicator that country conditions have changed, and would transcend the purposes of the asylum laws.

Second, Tambadou does not prevent the agency from resting its finding of changed country conditions solely on country reports even if other record evidence conflicts with it.

Third, Tambadou does not require that the agency perform and enunciate any kind of specific, on-record "analysis" justifying its findings that country conditions have changed. "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be

-13-

compelled to conclude to the contrary."  8 U.S.C. §

1252(b)(4)(B).  The agency's findings with respect to

changed country conditions are therefore upheld when record

evidence supports those determinations.  To survive our

review for substantial evidence, the agency need not engage

in special on-record recitation of facts, or perform any

ceremony or incantation.