09-0768-ag
Lecaj v. Holder

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: May 11, 2010          Decided: August 3, 2010)

Docket No. 09-0768

- - - - - - - - - - - - - - - - - - - -x

FATMIR LECAJ,

                Petitioner,

       - v.-

ERIC H. HOLDER, JR., UNITED STATES
ATTORNEY GENERAL,

                Respondent.

- - - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, Chief Judge, WINTER and
                 McLAUGHLIN, Circuit Judges.

Petitioner Fatmir Lecaj, a native of the former Yugoslavia, seeks review of the order of the Board of Immigration Appeals and the decision of the Immigration Judge denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. We deny the petition for review.

THOMAS MOSELEY, Newark, NJ, for Petitioner.

YAMILETH G. HANDUBER, Trial Attorney, Office of Immigration Litigation (Ada E. Bosque, Trial Attorney, Office of Immigration Litigation; William C. Peachey, Assistant Director, Office of Immigration Litigation; and Tony West, Assistant Attorney General, Civil Division, on the brief), United States Department of Justice, Civil Division, Washington, D.C., for Respondent.

DENNIS JACOBS, Chief Judge:

Petitioner Fatmir Lecaj, a native of the former Yugoslavia, seeks review of the order of the Board of Immigration Appeals (the "BIA") and the decision of Immigration Judge Paul A. DeFonzo (the "IJ") denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). In re Fatmir Lecaj, No. A 99 075 388 (B.I.A. Jan. 30, 2009), aff'g No. A 99 075 388 (Immig. Ct. N.Y. City July 25, 2007). Lecaj was born in Montenegro when it was a component of Yugoslavia; he claims he was persecuted because of his Albanian ethnicity and other characteristics during a time Serbia and Montenegro were in a federation following the

2

dissolution of Yugoslavia.  Since his departure, Montenegro has become independent of Serbia.

Lecaj principally argues that (1) the agency should have considered Serbia (rather than Montenegro) as the country of removal; and (2) the agency failed to undertake a sufficiently individualized evaluation of how the changes in Montenegrin country conditions would affect him.  The petition for review is denied.

**BACKGROUND**

The IJ made "an overall positive credibility determination in this case" and recounted the following incidents suffered by Lecaj:  As a member of the Serbian/Montenegrin Armed Forces in 2001 and 2002, Lecaj "was frequently harassed and was beaten on at least one occasion" on account of his Albanian ethnicity.[1]  In March 2003, police officers came to Lecaj's place of employment, destroyed documents, and threatened him.  In December 2003,

---

[1] As the IJ observed, no beating was mentioned in the application and no reason was proffered for the omission. The IJ gave Lecaj "the benefit of the doubt" on this point, but considered "the inconsistency to be unresolved and to be evidence of a lack of credibility."

they returned, beat him, and accused him of being a terrorist. In February 2004, border guards (of some entity) confiscated gifts he was carrying for relatives and accused him of being a terrorist. In May 2004, two police officers came to his place of employment, arrested him, transported him to the police station, put him in a room, questioned him, and beat him. After this last incident, Lecaj left for the United States.[2]

Lecaj entered this country in June 2004, using a false passport. In June 2005, he filed an affirmative application--which he later amended--seeking asylum, withholding of removal, and CAT relief. He claimed past persecution and a well-founded fear of persecution in the future based on (i) nationality--he is an ethnic Albanian, (ii) religion--he is Muslim, and (iii) political opinion--he was an active member of the Democratic League of Montenegro and the Democratic League of Kosovo.

In August 2005, Lecaj was served with a Notice to Appear charging him with removability based on his entry to the United States without valid travel documents. At a February

---

[2] This is perhaps odd: Montenegro shares a border with Albania.

4

2006 hearing, Lecaj conceded removability, and renewed his application for asylum, withholding of removal, and CAT relief.  At that hearing, Lecaj declined to designate a country for prospective removal.  The government proposed Serbia and Montenegro (then in federation), and the IJ accepted that proposal.

At a July 25, 2007 merits hearing, the IJ observed that Montenegro had become independent since the previous hearing and asked Lecaj from what country he sought withholding of removal.[3]  Lecaj designated Montenegro.  The IJ found that Lecaj "is a citizen of Montenegro in view of the presentation . . . of a Birth Certificate indicating that he

---

[3]

> [A]t the conclusion of World War II, [Montenegro] became a constituent republic of the Socialist Federal Republic of Yugoslavia.  When the latter dissolved in 1992, Montenegro federated with Serbia, first as the Federal Republic of Yugoslavia and, after 2003, in a looser union of Serbia and Montenegro.  In May 2006, Montenegro invoked its right under the Constitutional Charter of Serbia and Montenegro to hold a referendum on independence from the state union.  The vote for severing ties with Serbia exceeded 55%--the threshold set by the [European Union]--allowing Montenegro to formally declare its independence on 3 June 2006.

The World Factbook, Montenegro, https://www.cia.gov/library/publications/the-world-factbook/geos/mj.html (last visited July 27, 2010).

is from the Montenegro region of Serbia/Montenegro." The IJ further found that Lecaj possessed "a subjective fear of returning to his homeland," but "in view of changed circumstances in Montenegro [Lecaj] no longer possesses a sufficient, objective basis of fearing persecution in that country." Accordingly, the IJ denied asylum, withholding of removal, and CAT relief, and ordered Lecaj's removal to Montenegro.[4]

Lecaj timely appealed the IJ's decision to the BIA. On January 30, 2009, the BIA dismissed Lecaj's appeal. Relying heavily on the United States Department of State Country Reports on Human Rights Practices--Montenegro 2006 (the "Report"), the BIA determined that "[e]ven if [Lecaj] had established past persecution on account of ethnicity by the Serbian-controlled police and military, the [IJ] correctly found that the presumption of a well-founded fear of future persecution had been rebutted."

**DISCUSSION**

---

[4] The IJ also denied Lecaj's application for voluntary departure.

"When the BIA does not expressly adopt the IJ's decision, but its brief opinion closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." Zaman v. Mukasey, 514 F.3d 233, 237 (2d Cir. 2008) (per curiam) (internal quotation marks omitted). We review factual findings under the deferential substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Manzur v. U.S. Dep't of Homeland Sec., 494 F.3d 281, 289 (2d Cir. 2007). "Legal questions, including mixed questions of law and fact and the application of law to fact, are reviewed de novo." Manzur, 494 F.3d at 288.

**I**

Lecaj argues that he is not a citizen of Montenegro. Even assuming that he has administratively exhausted that argument, see Lin Zhong v. U.S. Dep't of Justice, 480 F.3d 104, 118-22 (2d Cir. 2007) (explaining that the judicially imposed issue exhaustion requirement is not jurisdictional, but is ordinarily mandatory), it lacks merit. The IJ

7

reasonably designated--and the BIA implicitly adopted-- Montenegro as the country of removal in accordance with 8 U.S.C. § 1231(b)(2)(D) and (E).  The extract from the birth registrar submitted in support of Lecaj's application indicated that he was born in and is a citizen of Montenegro.  Lecaj's application listed Montenegro as his birthplace and last address before entering the United States.  Moreover, Lecaj designated Montenegro as the country from which he sought withholding of removal, and submitted evidence regarding the likelihood of future persecution in Montenegro (and nowhere else).

**II**

Lecaj argues that the agency failed to undertake a sufficiently individualized analysis of how changes in Montenegrin country conditions would affect him.  See Alibasic v. Mukasey, 547 F.3d 78, 87 & n.6 (2d Cir. 2008); Passi v. Mukasey, 535 F.3d 98, 101-02, 103-04 (2d Cir. 2008).  The agency seems to have overlooked or discounted aspects of the Report and other evidence bearing on Lecaj's ethnicity and situation.  Nevertheless, we conclude that remand is not warranted because "we can state with

confidence that the same decision would be made if we were to remand." Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 335 (2d Cir. 2006). Any oversight or discounting does not disturb the agency's conclusion--supported by substantial evidence--that the record demonstrates no pattern or practice of persecution likely to beset Lecaj. After Lecaj's departure, Montenegro became independent and country conditions fundamentally changed.

To establish eligibility for asylum, an applicant must show that he "has suffered past persecution" or "has a well-founded fear of future persecution." 8 C.F.R. § 1208.13(b). "An applicant who has been found to have established . . . past persecution shall also be presumed to have a well-founded fear of [future] persecution on the basis of the original claim." Id. § 1208.13(b)(1). That presumption may be rebutted if "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" in the relevant country. Id. § 1208.13(b)(1)(i)(A). The government bears the burden to establish such a fundamental change in country conditions by a preponderance of the evidence. Id. § 1208.13(b)(1)(ii).

To determine whether the government has rebutted the presumption entails "an individualized analysis of whether the changes in conditions in [the relevant country] were so fundamental that they are sufficient to rebut the presumption that [an applicant's] fear of persecution is well founded."  Passi, 535 F.3d at 103-04.  This individualized analysis may justify different outcomes for applicants from the same country, even where the agency considers the same documentary evidence:

> While the State Department country reports often provide "a useful and informative overview of conditions in the applicant's home country," we have instructed the immigration courts "not to place excessive reliance" on them.  Tian-Yong Chen v. INS, 359 F.3d 121, 130 (2d Cir. 2004).  In Tambadou v. Gonzales, we explained that the BIA cannot rely in a conclusory fashion on information in a State Department country report about "general changes in the country."  446 F.3d at 303 (internal quotation marks omitted).  Instead, we explained, the BIA must "use the information in the [r]eport in a case-specific manner and supplement it with further analysis," that is, the BIA must "conduct an individualized analysis of how changed conditions would affect the specific petitioner's situation."  Id. (internal quotation marks and alteration omitted).

Id. at 101-02 (alteration in original).  "[W]here a report suggests that, *in general*, an [applicant] would not suffer or reasonably fear persecution in a particular country, the

immigration court is still obligated to consider also any contrary or countervailing evidence with which it is presented, as well as the particular circumstances of the applicant's case as demonstrated by testimony and other evidence."  Alibasic, 547 F.3d at 87 n.6 (internal quotation marks omitted).  This individualized assessment explains--at least in part--why this Court has reached different outcomes regarding petitions challenging the agency's assessment of changed country conditions in Montenegro.[5]

_____

[5] In three recent cases, this Court granted the petition, vacated, and remanded because it found that substantial evidence did not support the determination of a fundamental change in Montenegrin country conditions.  See Ljikovic v. Filip, 308 F. App'x 563, 564-65 (2d Cir. 2009); Alibasic v. Mukasey, 547 F.3d 78, 81, 83, 86 (2d Cir. 2008); Gjonbalaj v. Mukasey, 277 F. App'x 113, 115 (2d Cir. 2008).  In five recent cases, this Court denied the petition because substantial evidence supported the determination of a fundamental change in Montenegrin country conditions.  See Balidemaj v. Holder, 346 F. App'x 705, 708 (2d Cir. 2009); Djombaljic v. Holder, 340 F. App'x 694, 696 (2d Cir. 2009); Bracic v. Holder, 330 F. App'x 286, 287 (2d Cir. 2009); Vuljaj v. Mukasey, 261 F. App'x 325, 326-27 (2d Cir. 2008); Sadiki v. Gonzales, 218 F. App'x 27, 29-30 (2d Cir. 2007).
These decisions--almost exclusively non-precedential-- offer only limited guidance for the instant case because the evidence under consideration in these eight cases generally preceded Montenegrin independence.  That said, we recognize that Djombaljic and Gjonbalaj inconsistently treated the State Department 2005 country report, and we further recognize the need for panels of this Court to strive for consistent treatment of such reports within the requisite individualized analyses.

Considered by itself, the Report constitutes substantial evidence of a fundamental change in Montenegrin country conditions sufficient to rebut any presumption of a well-founded fear of future persecution:

- "The government generally respected the human rights of its citizens."

- "There were no reports that the government or its agents committed arbitrary or unlawful killings" and "no reports of politically motivated disappearances."

- "The constitution and law provide for freedom of religion, and the government generally respected this right in practice."

- "Minority religious communities reported better cooperation with government organizations, leading to increased ability to operate normally."

- In the 81-seat Assembly, "[f]ive seats were set aside by law for ethnic Albanians."

- "Ethnic Albanians, Muslims, Bosnia[n]s, and Croats participated in the political process, and their parties, candidates, and voters participated in all elections."

Lecaj emphasizes, however, that the Report also shows appreciable levels of violence and disorder:

- "[D]uring the year, there were reports of arbitrary arrest, police mistreatment of suspects in detention, police impunity, lengthy pretrial detention and delayed trials, substandard prison conditions, corruption in law enforcement agencies and the judiciary, trafficking in persons, and discrimination against women and ethnic minorities."

12

- "[P]olice occasionally beat suspects during arrests or while suspects were detained for questioning."

- "Impunity was a problem; the government investigated police abuses, but criminal procedures and sentences against police were rare. . . . Police corruption was a problem; the small, close-knit society discouraged the reporting of corruption and facilitated criminals' access to law enforcement officers."

- "[S]ome elements in society continued to discriminate against [religious] communities."

- "The ruling Democratic Party of Socialists (DPS) has held power without interruption, in various coalitions, ever since the reintroduction of multiparty democracy in 1991. The DPS is, however, on an equal footing with all other parties."

All these passages from the Report, taken together, reflect benign and tolerant prevailing conditions, generally, with some disquieting exceptions.

But the issue here is how the Report bears upon the requisite individualized assessment. The generally enlightened environment does not foreclose persecution aimed at persons with Lecaj's ethnic, religious, and political characteristics. By the same token, the disquieting exceptions do not suggest that Lecaj would be the victim of such abuses. In short, the Report does not categorically determine an outcome if the evidence shows that the

13

applicant may be exceptional.  Lecaj argues that notwithstanding positive developments, he remains vulnerable to persecution on account of his Albanian ethnicity, Muslim faith, and political advocacy on behalf of Albanians in Montenegro.

Lecaj argues that the ongoing police abuses referenced in the Report, coupled with other evidence, undermine the conclusion that changed country conditions alleviate the risk of his future persecution.  He testified that it is "hard for me to even think about having to return to Montenegro.  It's the same Government in charge.  The same Police are there.  The same people are in charge."  He further testified that if those "same people . . . see me, they'll right away remember what I had done in the past.  And, then the same thing, I believe, would happen to me."

Although the Report reflects ongoing police abuses, it does not link those abuses to Lecaj's ethnicity, religion, political opinion, or conduct prior to Montenegrin independence.  Lecaj's speculative anxiety, however sincere, does not render objectively reasonable his fear of future persecution--especially absent evidence regarding "any incidents of persecution directed at" his family members

14

remaining in Montenegro. Moreover, one incident of past persecution occurred at the border of Kosovo (then a province of Serbia, which at the time was federated with Montenegro) and another during Lecaj's military service. In view of the intervening independence of Montenegro and Lecaj's discharge from the military, these incidents do not presage future persecution. Finally, Lecaj testified that he could fill a book with evidence of continuing persecution against ethnic Albanians in Montenegro; but, as the IJ observed, Lecaj "had this opportunity and has not submitted any evidence of a pattern or practice of persecution directed at Ethnic Albanians in Montenegro, at Muslims in Montenegro, or at Ethnic Albanians or other individuals seeking to further the cause of Albanians politically in Montenegro."

Lecaj further contends that the agency failed to consider evidence that bears upon the individualized assessment of his risk of future persecution. Specifically, Lecaj cites articles reporting the mistreatment of fourteen ethnic Albanians accused of plotting terrorist attacks.[6]

---

[6] Lecaj submitted (i) a Detroit Free Press article reporting that five of the suspects "complained of being tortured while in police custody," but also noting that

15

This Court has previously rejected reportage of this incident as evidence that ethnic Albanians--as a group--are subject to persecution.[7]  Although Lecaj testified that he was twice accused of being a terrorist (by police and border guards who mistreated him), the arrest and alleged

"[e]thnic Albanians . . . generally have good relations with the government"; (ii) an Amnesty International press release focusing on this alleged torture and citing a report by the European Committee for the Prevention of Torture that "documented numerous allegations of torture and other ill-treatment from persons recently detained by the police in Montenegro"; (iii) an ABC News article citing the leader of an ethnic Albanian party as saying that "the arrests represented a political provocation, as most of the suspects were either party supporters or candidates" in imminent elections; and (iv) an Albanian American Civic League statement quoting a chapter head as saying: "For sixteen years, the government of Milo Djukanovic has trained the Montenegrin police to intimidate, beat, and torture Albanians."

[7] See, e.g., Djombaljic v. Holder, 340 F. App'x 694, 696 (2d Cir. 2009) (explaining that although asylum applicants cited "to articles indicating that fourteen ethnic Albanians had been jailed and allegedly abused by the police in Montenegro[,] . . . those individuals had been arrested on suspicion of terrorism" and "petitioners fail[ed] to demonstrate that they would be perceived as terrorists by the Montenegrin government, or that they would receive the same treatment because of their Albanian ethnicity"); Gorvokovic v. Filip, 307 F. App'x 569, 571 (2d Cir. 2009) ("In support of his motion, Gorvokovic submitted several documents indicating that police arrested fourteen Albanians, who claim that they were tortured and mistreated during detention.  He submitted no evidence, however, that he was similarly situated to those individuals who were arrested on suspicion of terrorist activity.").

mistreatment of the fourteen ethnic Albanians--the single incident in the record involving purported abuses of individuals in one of Lecaj's threatened categories--does not render his fear of future persecution objectively reasonable. One of the submitted articles also observed generally good relations between the Montenegrin government and ethnic Albanians. The reportage is entirely consistent with police mistreatment motivated by animus against suspected terrorists--of any ethnicity, religion, or political opinion.

Nevertheless, it does appear that the agency overlooked certain evidence that is of potential interest. Ethnic Albanians remain a small minority in Montenegro. Despite Lecaj's testimony that "Serb Police are still empowered in Montenegro in view of the fact that the Government and the Organs of State Security are still pro-Serb," the IJ determined that "as Montenegro is no longer under the dominion of Serbia or Yugoslavia, [Lecaj] no longer has any basis to fear anything from Serb or Yugoslavian Authorities." But Montenegro contains a substantial Serb population; the Democratic Party of Socialists remains in power, albeit sharing that power with other political

17

parties; and the Report repeatedly referred to ongoing police abuses.

On appeal, the BIA determined that the Report "did not reflect widespread episodes of harassment or persecution of the Albanian minority but instead indicated that [the] new government cooperated with investigations of 'police brutality and other abuses.'" The BIA further determined:

> [The government] presented adequate evidence to show that the conditions in Serbian-controlled Montenegro that contributed to the problems faced by [Lecaj] in 2001-2004 have significantly changed, such that [Lecaj] no longer has a well-founded fear of future persecution. Even if, as [Lecaj] claims, the people who previously harassed and beat him are "still living in Montenegro," the record lacks evidence from which we could conclude that the Montenegrin government would fail to protect [Lecaj]. In fact, the record evidence tends to support the opposite conclusion.

(citations omitted). These determinations overlook the Report's repeated references to ongoing police abuses and the persistent failure to achieve accountability for those abuses.

The agency thus overlooked or discounted certain evidence in the record. However, we conclude that remand is not warranted. Although the Report indicates ongoing police abuses, those abuses are not tied specifically to Albanian ethnicity, the Muslim religion, or political advocacy on

18

behalf of Albanians in Montenegro. In the absence of contrary evidence, the Report's description of general changes in Montenegrin country conditions therefore rebuts the presumption of a well-founded fear of future persecution. The evidence presented by Lecaj indicates only a single incident of police abuse directed at ethnic Albanians, and the reportage of that incident is consistent with animus against suspected terrorists. In view of (i) the general changes in Montenegrin country conditions set forth in the Report; (ii) the absence of any evidence of mistreatment of persons in a threatened category to which Lecaj belongs (other than that related to the fourteen terrorism suspects); and (iii) the absence of any evidence of a pattern or practice of persecution directed at ethnic Albanians, Muslims, or political activists on behalf of Albanian causes, substantial evidence supports the agency's conclusion that the government satisfied its burden of demonstrating by a preponderance of the evidence a fundamental change in country conditions sufficient to rebut any presumption of a well-founded fear of future

persecution.[8]

**III**

To the extent Lecaj seeks review of the denial of withholding of removal and CAT relief, such review is denied. Withholding of removal and CAT relief entail a greater likelihood of future persecution than that required for the grant of asylum. "Withholding of removal . . . is a mandatory form of relief reserved for aliens who demonstrate a *clear probability* of future persecution on account of a protected characteristic." Kone v. Holder, 596 F.3d 141,

---

[8] The presumption of future persecution that arose from Lecaj's persecution in the past has been overcome by the government's showing of changed country conditions. However, Lecaj also attempted to show that, independent of the presumption, he affirmatively established a well-founded fear of future persecution.

A well-founded fear of future persecution is "a subjective fear that is objectively reasonable. A fear is objectively reasonable even if there is only a slight, though discernable, chance of persecution." Kone v. Holder, 596 F.3d 141, 146 (2d Cir. 2010) (internal quotation marks omitted). Without the presumption, an asylum applicant bears the burden of establishing a well-founded fear of future persecution. See 8 C.F.R. § 1208.13(b)(2)(iii).

As explained above the line, the government discharged its burden of rebutting any presumption of a well-founded fear of future persecution. Based on identical evidence, Lecaj therefore cannot satisfy his burden of establishing an objectively reasonable fear of future persecution.

20

147 (2d Cir. 2010) (emphasis added). "Protection under the CAT . . . requires the applicant to 'establish that it is *more likely than not* that he or she will be tortured if removed to the proposed country of removal.'" Id. (emphasis added) (quoting 8 C.F.R. § 1208.16(c)(2)). Because Lecaj fails to demonstrate the "slight, though discernable, chance of persecution" required for the grant of asylum, id. at 146, he necessarily fails to demonstrate the "clear probability of future persecution" required for withholding of removal, id. at 147, and the "more likely than not" to be tortured standard required for CAT relief, id.[9]

---

[9] At oral argument, counsel for Lecaj pressed two additional arguments.

First, he argued that Lecaj should be granted humanitarian asylum based on the severity of the past persecution Lecaj suffered. "A petitioner may . . . , in certain circumstances, establish asylum eligibility on the basis of past persecution without regard to any well-founded fear of future persecution in what is frequently referred to as 'humanitarian asylum.' This relief is reserved for persecuted aliens whose persecution was particularly severe or who may suffer 'other serious harm' if removed." Kone, 596 F.3d at 146 (citation omitted). The record does not indicate that this argument was presented to the BIA. But even assuming administrative exhaustion, see Lin Zhong v. U.S. Dep't of Justice, 480 F.3d 104, 118-22 (2d Cir. 2007) (explaining that the judicially imposed issue exhaustion requirement is not jurisdictional, but is ordinarily mandatory), this argument lacks merit. Humanitarian asylum is reserved for "certain rare cases," Mirzoyan v. Gonzales, 457 F.3d 217, 220 (2d Cir. 2006), in which "[t]he applicant has demonstrated compelling reasons for being unwilling or

21

**CONCLUSION**

For the foregoing reasons, the petition for review is **DENIED.** As we have completed our review, any pending motion for a stay of removal in this petition is **DISMISSED** as moot.

---

unable to return to the country arising out of the severity of the past persecution," 8 C.F.R. § 1208.13(b)(1)(iii)(A). The record does not remotely show past persecution so severe as to warrant humanitarian asylum.

Second, counsel for Lecaj argued that the BIA weighed changed country conditions for "adequate evidence," despite the government's burden of proof by a preponderance of the evidence, 8 C.F.R. § 1208.13(b)(1)(ii). Assuming that "adequate evidence" is inconsistent with a "preponderance of the evidence" standard, this inconsistency is cured by the BIA's citation to Matter of D-I-M-, 24 I. & N. Dec. 448 (B.I.A. 2008).